JOE LOUIS WISE

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 841900 & 850232

November 27, 1985

Present: All the Justices

*William B. Claiborne* for appellant. (Record Nos. 841900 and 850232).

*Margaret Poles Spencer, Assistant Attorney General (William G. Broaddus, Attorney General*, on brief), for appellee. (Record Nos. 841900 and 850232).

POFF, J., delivered the opinion of the Court.

In a consolidated trial, a jury convicted Joe Louis Wise of capital murder in the commission of armed robbery, armed robbery, use of a firearm in the commission of a felony, and grand larceny. The trial court confirmed the four verdicts and imposed penitentiary sentences of life for robbery, two years for the use of a firearm, and 20 years for grand larceny. In a separate proceeding, *see* Code §§ 19.2-264.3 and -264.4, the jury fixed the penalty for the capital conviction at death, and the court entered final judgment imposing the sentence. We have certified Wise's appeals in the non-capital cases to this Court, *see* Code § 17-116.06(B)(1), combined those appeals with his capital appeal and the penalty review mandated by Code § 17-110.1, and accorded the several proceedings priority on our docket, *see* Code § 17-110.2.

We will consider the questions presented as stated on brief by the defendant. All but two are addressed to the conduct of the guilt phase of the consolidated trial. Wise challenges the selection of the jury, several evidentiary rulings, certain conduct of the attorney for the Commonwealth, and the sufficiency of the evidence. Concerning the penalty phase of the capital trial, Wise contends that the death penalty was the product of passion or prejudice and was disproportionate to the penalty imposed in similar cases.

## SELECTION OF THE JURY

Prospective jurors were questioned individually and privately. The trial court seated three veniremen over Wise's challenge for cause. The court should have stricken John L. Tucker, Wise argues, because "he had a long standing friendship with the Commonwealth's Attorney and [they] had been golfing buddies on many occasions."

■ We have held that a prospective juror is not disqualified to sit on a criminal case solely because he has a familial or an attorney-client relationship with the Commonwealth's Attorney. *Calhoun* v. *Commonwealth*, 226 Va. 256, 263, 307 S.E.2d 896, 900 (1983); *accord Elam* v. *Commonwealth*, 229 Va. 113, 116, 326 S.E.2d 685, 687 (1985). It follows that a social relationship, standing alone, is no cause for disqualification. *See Lane* v. *United States*, 321 F.2d 573 (5th Cir. 1963), *cert. denied*, 377 U.S. 936 (1964). Tucker's responses to questions from the bench clearly negate any danger of bias.

Prospective juror Gladys McKinney should not have been seated, Wise says, because she "gave vague answers", "stated she was confused", and raised "grave questions about her ability to sit impartially as a juror." McKinney had read newspaper articles about the crimes and Wise's arrest. She thought "it was a terrible thing that happened" and "justice ought to be done". Asked by defense counsel if Wise "should have been arrested", she replied, "Yes."

Wise argues that McKinney's answer reflects an opinion that he was guilty because he was arrested. But the standard for arrest of a suspect is probable cause; the standard for conviction of an accused is proof beyond a reasonable doubt. The fact that McKinney thought Wise should have been arrested as a suspect does not show that she thought he deserved to be convicted. In unequivocal answers to searching inquiries by the court, McKinney declared that what she had learned from the newspapers would not affect her impartiality or ability to give Wise a fair trial, that she was not sensible of any bias or prejudice against the defendant, and that she could enter the jury box with an open mind and wait until the entire case was concluded before reaching a fixed opinion about the guilt or innocence of the accused.

■ Looking to the "entire *voir dire* rather than the single answer and question", *Fitzgerald* v. *Commonwealth*, 223 Va. 615, 628, 292 S.E.2d 798, 805 (1982), *cert. denied*, 459 U.S. 1228

(1983), we uphold the trial court's finding that McKinney was qualified to sit on this jury.

■ Prospective juror Rebecca Hood stated that she believed in capital punishment. "How strong do you believe in it?" defense counsel inquired. "If the evidence calls for it," she replied. Pressed further, Hood explained that she meant "[t]he evidence presented in this courtroom." We find nothing in this dialogue or elsewhere in the *voir dire* to support the defendant's argument on appeal that Hood's "state of mind is such that she could not give the defendant a fair trial."

## THE EVIDENCE OF RECORD

We review the facts in the light most favorable to the Commonwealth. The victim of these crimes was William Ricketson, a superintendent at the Mecklenburg Correctional Center. About 4:00 p.m. on December 1, 1983, Ricketson prepared to leave his home in Boydton to get a haircut and go deer hunting on property near Chase City. He laid $12.00 on a table for household expenses, but his wife told him he would need the money to pay for his haircut. Ricketson left in a white Ford pickup truck carrying a rifle and a shotgun. At Chase City, he got a haircut and bought a soft drink and a candy bar. He paid the bills with money taken from a wallet kept in his pants pocket.

At 1:00 p.m. the next day, Ricky Symmonds, a North Carolina deputy sheriff, stopped to investigate a white pickup parked on the shoulder of the southbound lane of Interstate Route 95. The defendant was adding oil to the engine. A service station attendant had informed the police that the driver of the pickup was armed. The officer recovered a .25 caliber pistol from Wise's pocket, arrested him for carrying a concealed weapon, and locked him in the county jail. The pickup was registered in Ricketson's name. During an inventory search of the vehicle, the police seized two shotguns. One was later identified as a gun Wise had taken to a gun shop for repairs and the other as a gun Ricketson used for hunting. On Wise's person, the police discovered two wallets. One contained Wise's driver's license; the other was empty.

On the same afternoon, Ernest Mitchell, a resident of Middlesex, North Carolina, reported to the Mecklenburg sheriff's department that Wise had told him and other friends that he had killed a man and "put him in a hole" behind the old excelsior plant in Chase City. The plant had been converted for use as a flea mar-

ket, and the office was used as a residence. Investigating officers found blood at a point on the shoulder of the road near the building. A trail of blood led from the road to the driveway, across a sidewalk, and then to the edge of a hole in the ground behind the building. The hole, which had been dug for use as an outdoor toilet, was filled with water, mud, and human feces. From this hole, the officers recovered Ricketson's body which had been completely submerged under the weight of a number of cinder blocks. Ricketson's trousers had been pulled down, inside out, to the top of his boots, and his wallet was missing.

An autopsy revealed multiple injuries resulting from blunt-force blows to the head, including scalp wounds and a skull fracture. Three fingers were broken, and flesh had been torn from the nose, chin, and forehead. A bullet fired at close range had perforated the right eyeball and lodged near the surface behind the left ear. A ballistics test showed that this bullet had been fired from the .25 caliber pistol taken from Wise when he was arrested.

Ricketson had also suffered a chest wound from a shotgun blast. The pellets were recovered from a point just beneath the skin. According to a forensic scientist, the shallow penetration supports the conclusion that the victim was under water when the gun was fired. The medical examiner found "water and clay and gritty sand" in the nose, mouth, lungs, and stomach of the body which, he said, showed that the victim had "breathed and swallowed the muddy water with the sand and the grit when he was alive." The gunshot wounds and the skull fracture were lethal injuries, but drowning was the ultimate cause of death.

Called as a witness for the Commonwealth, Shirley Whittaker testified that Wise came to her trailer home in Middlesex between 1:00 a.m. and 2:00 a.m. on December 2, 1983. Wise told her that "he had just killed a man", that "he shot the man in the eye", that "he took the man outside the house, around the house, he beat the man with the gun and broke the gun handle over the man's head", that he threw the man in a "hole that they had dug around the back of the house for a toilet", and that he "threw some dirt over him and bricks." Wise declared that "the man had only six dollars." Responding to a question posed by defense counsel, Whittaker added, "He said he got it out of the man's pocket." Wise was wearing a green coat stained with blood. "He pulled that off," Whittaker said, "and carried it out and burned it up."

Before Wise left, Whittaker called her next-door neighbor, Mary Booth, to come to her trailer. Booth testified that Wise, her stepson, told her that he had shot an intruder when he reached for his pocket and that he took him outside and "beat him and then he put him in a hole." Booth saw a .25 caliber pistol, a shotgun with a broken stock, and a driver's license bearing Ricketson's name, all lying on the floor of the trailer. Ricketson's wife identified the shotgun as the one her husband carried the day of the crimes.

In response to a telephone call from Mary Booth, Clarice Bowser drove to the trailer. Bowser testified that Wise told her that he had surprised a stranger at the excelsior plant, that "the man went for his pocket and he said he shot the man . . . [and] he drug him behind the house and put him in a hole".

Wise made eight statements concerning the crimes with which he was charged. In addition, while incarcerated awaiting trial, he requested, took, and failed a lie detector test, agreed to give testimony by deposition, and participated in a recorded telephone conversation with Whittaker. The results of the polygraph test, the contents of the statements and the deposition, and portions of the tape recording were admitted into evidence without objection.

Wise changed his story repeatedly. In some of his statements, he implicated third parties in one or more of the several offenses. In his first statement, he denied any knowledge of the crimes. Three days later, he said he had returned to the plant and found Ricketson "out in the shop". Ricketson "made some kind of move toward his back pocket and I shot him with the .25 automatic. I drug him outside and around the house. I left him on the side of the house. I didn't put him in no hole."

In his third statement, Wise admitted the shooting but said that a man named Frank Craddock had beaten Ricketson with a shotgun. According to his fourth statement, Wise was inside the building when "some man pulled up in the yard in a white truck" and "used the yard for a bathroom." Wise went outside and confronted the man, and a fight ensued. Ricketson started towards the truck, Wise "shot him at close range", Ricketson "fell close to the road", and Wise "picked him up . . . and dragged him around the house." Contradicting his former account, Wise admitted that Frank Craddock "won't [sic] there," and that "I did all this alone." Asked why he had "put this man in a hole", he replied, "I don't know, I just did it."

On December 12, Wise asked for a fifth interview and signed a transcript of the dialogue. He told the police that he had struck Ricketson twice in the head with a shotgun, that he had put him in the hole because there "was water in the hole and I wanted to move the body out of sight in case someone came in the yard", that he shot Ricketson "[w]hile he was in the hole", that "he won't [sic] dead when I shot him with the shotgun", and that he had acted entirely alone. Ricketson's billfold "was on the dashboard of the truck."

Wise's sixth statement was contained in two letters he wrote to a deputy sheriff later in December. His former statements were false, he said, "because I was afraid and I was paid [$200.00] by one John Spruill to keep my mouth shut". Wise declared that Spruill shot Ricketson "with a .25 caliber pistol . . . hit the man with the rifle . . . drug the man to a hole and then shot into the hole."

In January, Wise made a seventh statement in a telephone interview with the police. On this occasion, Wise said that Shirley Whittaker shot Ricketson with the pistol, that Ernest Mitchell beat him with the shotgun, that Mitchell and Ray Booth, Wise's father, "pulled his pants down", "took his billfold", "dragged him by the legs", and "put the man in the hole", and that Ray Booth "shot in the hole". Repeating this account in a formal deposition, Wise claimed that his earlier confessions had been made to protect his father.

Called as adverse witnesses by the accused, Shirley Whittaker and Clarice Bowser repeated the testimony they had given as witnesses for the Commonwealth. In addition, Whittaker said that Wise had told her that he knew that "the man didn't have but six dollars on him . . . [b]ecause I looked in his pocketbook and that's all the man had." Whittaker tape-recorded a telephone call Wise made to her in December while he was awaiting trial. She did so because she "was going to show this tape" in the event "Joe Wise would have got on the stand and implicated John Spruill and [Frank Craddock]." The Commonwealth offered the tape as an exhibit, the defendant waived objection, and the recording was played for the jury. Wise admitted that he shot Ricketson with the pistol, that he "beat him with his shotgun . . . throwed him in the hole, shot in the hole" and that no one else was present. "I didn't have . . . but six dollars," he said, "and I put that in the [gasoline] tank" because it was half empty.

## EVIDENTIARY QUESTIONS

### A. *Photographs*

The Commonwealth introduced three color photographs of the corpse as it was being lifted from the privy hole. The defendant argues that "[a]lthough these photographs . . . may have had some probative value, it was outweighed by the prejudicial and inflammatory nature of the photographs."

■ The pictures show the body covered with mud and other debris but no blood. The face is not shown, and the head and body wounds are not visible. The arms are positioned near the head in a defensive posture. While the pictures arouse one's pity, they are not inflammatory within the meaning of the rule Wise invokes. Compare photographs admitted in *Boggs* v. *Commonwealth*, 229 Va. 501, 508, 331 S.E.2d 407, 419 (1985); *Stockton* v. *Commonwealth*, 227 Va. 124, 144, 314 S.E.2d 371, 384, *cert. denied*, 469 U.S. 873 (1984); *Whitley* v. *Commonwealth*, 223 Va. 66, 74, 286 S.E.2d 162, 167, *cert. denied*, 459 U.S. 882 (1982); *Waye* v. *Commonwealth*, 219 Va. 683, 692, 251 S.E.2d 202, 207-08, *cert. denied*, 442 U.S. 924 (1979); and *Newberry* v. *Commonwealth*, 191 Va. 445, 455, 61 S.E.2d 318, 323 (1950).

■ "We have repeatedly held that the admissibility of photographs depicting the body of a murder victim is a matter within the sound discretion of the trial court." *Jones* v. *Commonwealth*, 228 Va. 427, 450, 323 S.E.2d 554, 566-67 (1984), *cert. denied*, 105 S.Ct. 2713 (1985). We find no abuse of discretion. The circumstances reflected in the pictures at bar were clearly competent to show that the homicide was deliberate and malicious.

### B. *Confrontation*

An investigating officer testified that Ernest Mitchell had been the first to report Wise's admission that he had killed a man and that Mitchell had directed the police to the broken shotgun and other items introduced at trial. The Commonwealth did not call Mitchell as a witness, and Wise complains that he was denied his right to confront one of his accusers.

■ "The Commonwealth was not required to call every possible witness in proving its case", *Robinson* v. *Commonwealth*, 207 Va. 66, 69, 147 S.E.2d 730, 732 (1966) (instruction on absent-witness presumption properly refused), and evidence adduced by the defendant himself shows that Mitchell's testimony "would have been

merely cumulative and corroborative and, thus, unnecessary." *Id.* Defense counsel asked a deputy sheriff who had interviewed Mitchell to read his statement to the jury. In that interview, Mitchell repeated what he had reported to the police the day after the murder and added that Wise had left the shotgun at his house.

Moreover, Mitchell was in jail at the time of Wise's trial and subject to compulsory process, at Wise's request, as a hostile witness. Finding no reason to believe that Wise was prejudiced by the Commonwealth's failure to call Mitchell to the stand, we reject the defendant's complaint.

## C. *Exclusion of Testimony*

Before the court adjourned for the day on Friday, defense counsel reserved the right to recall Commonwealth witnesses Whittaker, Booth, and Bowser, and the trial judge recognized them for appearance on Monday. Before court convened that day, the witnesses, residents of North Carolina, informed the Commonwealth's Attorney that they had no money to pay a babysitter while they were in Virginia and that their attorneys had advised them they were not legally obligated to appear. The trial judge granted Wise a continuance until Wednesday and authorized the Commonwealth's Attorney to use money from the sheriff's fund to pay babysitter fees.

Whittaker and Bowser appeared on Wednesday, and Wise called Whittaker as an adverse witness. Counsel attempted to ask why she had not appeared on Monday, and the court sustained the Commonwealth's objection. Assigning error to that ruling, the defendant argues that an answer to the question was relevant to the "state of mind and the credibility of a witness" and that, given an answer, the jury might have assessed the witness' adverse testimony "in a different manner."

While Whittaker was still on the stand, the Commonwealth's Attorney explained to the jury, at the court's request, that the witnesses were absent on Monday because they had no one to care for their children and that, pursuant to the court's instruction, he had made a trip to North Carolina and given "these ladies twenty dollars apiece for babysitter fees."

Because the record shows that the jury was fully apprised of the reason for the witnesses' reluctance to appear and the circumstances under which they agreed to appear, we find no merit in the assignment of error.

### D. *Allegations of Prosecutorial Misconduct*

Wise contends that he was prejudiced by the Commonwealth's questions concerning evidence which the trial court had excluded. The officer who conducted the interview with Wise on December 12 testified that, after Wise signed the transcript, he asked Wise if he had found any money in Ricketson's billfold. Wise replied, "Hell, man, it was only six dollars." Wise objected on the ground the *Miranda* waiver he had signed prior to the interview did not extend to the verbal admission. The trial court sustained the objection and instructed the jury to disregard the question and answer.

In two questions posed later in his examination of this officer, the Commonwealth's Attorney inquired whether Wise had said anything about money in the billfold. Noting that the jury had been instructed to disregard the officer's testimony on that point, the trial judge denied Wise's motion for a mistrial.

For purposes of this appeal, we assume that the trial court's ruling on the *Miranda* question was correct. *But see Washington v. Commonwealth*, 228 Va. 535, 548-49, 323 S.E.2d 577, 586 (1984), *cert. denied*, 105 S.Ct. 2347 (1985). We also accept Wise's view that the questions at issue were improper, and we consider whether the trial court committed reversible error in denying a mistrial.

> "[E]rror arising from an improper question or improper conduct of counsel may usually be cured by prompt and decisive action of the trial court without granting a motion for a mistrial." *Black v. Commonwealth*, 223 Va. 277, 286, 288 S.E.2d 449, 454 (1982). The trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights had been so indelibly prejudiced as to require a new trial. Unless we can say as a matter of law that this determination was wrong, it will not be disturbed on appeal. Unless the record shows the contrary, it is to be presumed that the jury followed an explicit cautionary instruction promptly given. *See Lewis v. Commonwealth*, 211 Va. 80, 84, 175 S.E.2d 236, 239 (1970).

*LeVasseur v. Commonwealth*, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983), *cert. denied*, 464 U.S. 1063 (1984). *See also Saun-*

*ders* v. *Commonwealth*, 218 Va. 294, 303, 237 S.E.2d 150, 156 (1977).

The officer's testimony that Wise had stated that his victim had only six dollars was merely cumulative. Whittaker had already testified that Wise told her the night of the crimes that "the man had only six dollars" which he had taken "out of the man's pocket." In light of that circumstance, we cannot say as a matter of law that the defendant's rights were so indelibly prejudiced by the questions posed by the Commonwealth's Attorney as to require a mistrial, and we will uphold the trial court's ruling.

Wise also charges that the Commonwealth's Attorney made "an improper and misleading statement of evidence during closing argument." In the course of summation, the Commonwealth's Attorney quoted from a transcript of the testimony of deputy sheriff Symmonds concerning the two wallets found at the time Wise was arrested. Defense counsel objected on the ground that "the wallets were never brought into evidence." On appeal, he argues that the Commonwealth's Attorney "was creating an inference that one of the wallets may have been the victim's".

It is immaterial that the wallets were not introduced as exhibits, and we see nothing improper or misleading in the argument. Counsel is always entitled to quote evidence of record in support of an inference he urges the jury to adopt. Whether the inference is justified by the predicate is a question for the jury.

## SUFFICIENCY OF THE EVIDENCE

The trial court erred, Wise insists, in denying his two motions to strike and his motion to set aside the verdict on the ground the evidence was insufficient to prove any of the four offenses with which he was charged.

The jury found Wise guilty of grand larceny in the theft of Ricketson's truck. On appeal, he argues that "he was not shown to have been in exclusive possession" of the truck. The defendant did not raise that ground for the trial court's consideration, and he cannot assert it for the first time in this Court. Rule 5:25 (formerly, Rule 5:21); *Ryan* v. *Commonwealth*, 219 Va. 439, 446, 247 S.E.2d 698, 703 (1978).

The jury convicted Wise of capital murder for "[t]he willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon." Code § 18.2-31(d). Three witnesses, including Wise's stepmother, testified

that Wise told them on the night of the murder that he had shot a man with a pistol, beat him with a shotgun, and put him in the privy hole. In the course of his several statements, Wise admitted all they had said and, in addition, explained that he had placed his victim, still alive, in the water to hide him from sight, that he had shot into the hole, and that he had acted alone. Except for Wise's inconsistent statements implicating third parties, this evidence stands unimpeached, and we hold that it was fully sufficient to prove that Wise was guilty of willful, deliberate, and premeditated homicide.

■ Nor does the evidence leave room for any reasonable doubt that Wise robbed his victim while armed with a deadly weapon. Ricketson had $12.00 in his wallet when he left home, and he made two expenditures in Chase City. One of the two wallets seized in the inventory search was empty and Ricketson's driver's license was found in Whittaker's trailer. Finally, in statements made in the presence of several witnesses and in interviews with the police, Wise complained that he had found only $6.00 on the man. It is immaterial whether the wallet was in the victim's pocket or, as Wise said on one occasion, on the dashboard of the truck. Ricketson's personal property was taken with intent to steal from his presence; proof of such a theft, accomplished by violence or intimidation, satisfies the definition of robbery, a common-law crime. *Pritchard* v. *Commonwealth*, 225 Va. 559, 561, 303 S.E.2d 911, 912-13 (1983).

■ Nevertheless, Wise maintains that the evidence fails to show a nexus between the homicide and the armed robbery as required by the capital murder statute. We disagree. The jury properly could have found that the theft occurred during or sometime after the first shot was fired but before the victim was submerged in the water where he drowned. Even if the wallet was taken from the truck after Ricketson expired, the homicide was a capital offense because "the evidence supports the conclusion that the killing and the theft were interdependent objects of a common criminal design". *Edmonds* v. *Commonwealth*, 229 Va. 303, 310, 329 S.E.2d 807, 813 (1985). *See also Linwood E. Briley* v. *Commonwealth*, 221 Va. 532, 544, 273 S.E.2d 48, 56 (1980), *cert. denied*, 451 U.S. 1031 (1981) (killing following robbery "part of the same criminal enterprise").

## THE PENALTY TRIAL

 The jury based the death penalty upon the "aggravated battery" leg of the "vileness" predicate. *See* Code § 19.2-264.2. Clearly, the multiple assaults visited upon Ricketson constituted "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979).

 Yet, Wise urges us to commute his sentence because, he claims, it was imposed under the influence of passion or prejudice. *See* Code § 17-110.1(C)(1) and (D)(2). He advances only one argument in support of his claim. The penalty, he contends, was the product of cumulative prejudice resulting from the alleged errors which he believes led to his conviction. "[S]ince we have determined that there was no error in the conduct of the guilt trial or the finding of an aggravated battery, there is no foundation for the defendant's cumulative-effect argument." *Boggs*, 229 Va. at 522, 331 S.E.2d at 422 (citation omitted).

The defendant asks us on brief to hold that the death penalty is excessive "in relation to the crime" of which he was convicted. He cites *Coker* v. *Georgia*, 433 U.S. 584 (1977), where the Supreme Court, observing that "the Eighth Amendment bars . . . punishments . . . that are 'excessive' in relation to the crime committed", *id.* at 592, held that a sentence of death for the crime of rape is cruel and unusual punishment. The *Coker* court also noted, however, that "in *Gregg* [v. *Georgia*, 428 U.S. 153 (1976)] . . . the Court's judgment was that the death penalty for deliberate murder was [not] . . . a punishment grossly disproportionate to the crime." *Id.*

 The General Assembly has decided that the death penalty for deliberate, premeditated murder in the commission of armed robbery is not disproportionate to the crime unless it is "disproportionate to the penalty imposed in similar cases". Code § 17-110.1(C)(2). In making the comparison mandated by the statute, we focus primarily upon cases in which the supreme penalty was based, as it was here, upon the vileness predicate. Those cases are assembled and annotated in *Jones* v. *Commonwealth*, 228 Va. 427, 450-51 n.3, 323 S.E.2d 554, 567 n.3 (1984), *cert. denied*, 105 S.Ct. 2713 (1985). *See also Washington* v. *Commonwealth, supra; Boggs* v. *Commonwealth, supra.*

We have examined the records in all the capital cases presented to this Court, including those in which a life sentence was imposed, and we find that juries in Virginia generally impose the death penalty for crimes comparable to the crime at bar. *See Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980).

Finding no error in the proceedings below, we will affirm the several convictions and uphold the penalties imposed.

*Affirmed.*