WALTER MILTON CORRELL, JR.

v.

COMMONWEALTH OF VIRGINIA

Record No. 860566

WALTER MILTON CORRELL, JR.

v.

COMMONWEALTH OF VIRGINIA

Record No. 860567

January 16, 1987

Present: All the Justices

*David A. Melesco; Shirley B. Jamison; (David A. Melesco, P.C.,* on briefs), for appellant. (Record Nos. 860566 & 860567)
*Gerald T. Zerkin (Zerkin, Heard & Scovill,* on brief), for appellant, on ineffective assistance of counsel claim. (Record Nos. 860566 & 860567)
*Katherine B. Toone, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee. (Record Nos. 860566 & 860567)

COCHRAN, J., delivered the opinion of the Court.

The trial court, sitting without a jury, convicted Walter Milton Correll, Jr., of capital murder for the willful, deliberate, and premeditated killing of Charles W. Bousman, Jr., in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(d), and of robbery. The court sentenced Correll to life imprisonment for the robbery. Code § 18.2-58. In the second phase of the bifurcated trial, the court heard evidence of aggravating and mitigating circumstances and, finding that the killing was outrageously and wantonly vile, horrible, and inhuman, sentenced Correll to death for the capital murder. Code §§ 19.2-264.2, -264.4.

Correll noted his appeal of the robbery conviction to the Court of Appeals. We certified that appeal to this Court under the provisions of Code § 17-116.06 (Record No. 860567) for consolidation with the appeal of the capital-murder conviction and the sentence review required by Code § 17-110.1 (Record No. 860566).

Correll challenges the constitutionality of the Virginia capital-murder statutes, arguing that they violate the dictates of *Furman* v. *Georgia*, 408 U.S. 238 (1972), by vesting in the Commonwealth's attorney complete discretion to determine whether a defendant will be tried for capital murder. This argument has been considered and rejected in prior cases. *See Gregg* v. *Georgia*, 428 U.S. 153, 199 (1976); *Proffitt* v. *Florida*, 428 U.S. 242, 254 (1976); *Jurek* v. *Texas*, 428 U.S. 262, 274 (1976); *Smith* v. *Commonwealth*, 219 Va. 455, 476, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979). We reaffirm that existence of discretion in prosecutors to decide whether to charge capital murder or to accept a plea to a lesser offense does not lead to arbitrary imposition of the death penalty and does not invalidate our capital-murder statutes.

## I. THE EVIDENCE

In the early morning of Friday, August 16, 1985, Bousman's body, covered with brush and undergrowth, was found in a wooded section of Franklin County, about 10 yards from State Route 634. Although the upper part of the body was extensively decomposed, an autopsy revealed two stab wounds to the chest. One wound penetrated the right lung, severed the pulmonary artery, and caused Bousman's death; the other wound was such that, untreated, it would have resulted in a collapsed lung and ultimately in death. Because of the degree of decomposition, the med-

ical examiner was unable to determine whether other, possibly fatal, wounds had been inflicted.

John Marshall Dalton, a codefendant who had entered into a plea agreement with the Commonwealth, was the Commonwealth's principal witness. He met Correll Saturday evening, August 10, 1985, at the home of Rhonda Small on Tazewell Avenue in Roanoke. Both men had been drinking; Dalton admitted that earlier in the evening he had taken a "couple of hits" of LSD. According to Dalton, he, Correll, and a third man, Richard Reynolds, left Small's home about 10:30 or 11:00 p.m. and walked until they reached a glass shop on Tazewell Avenue near the overpass at Interstate 581. As they walked, Correll initiated a conversation about "getting a car." Dalton testified that outside the glass shop Correll directed him and Reynolds to get a piece of glass, then go up the hill next to the overpass and wait. While his two companions waited on the hill, Correll remained below on Tazewell Avenue.

Dalton saw a maroon Buick automobile stop briefly beside Correll, depart, and return a few minutes later. Getting into the front passenger seat, Correll gave a hand signal for Dalton or Reynolds to approach. Dalton came to the car and, hearing the driver say he had seen someone behind the vehicle, attempted to hide under it. The driver got out; walking to the rear of the car, he discovered Dalton. Correll followed the driver, seized him in a stranglehold, and choked him until he lost consciousness. At Correll's direction, Reynolds came down the hill and used the car keys to open the trunk. Correll took the man's wallet, containing $10 and a credit card. After locking the victim in the trunk, the three men drove away in his car.

As Correll drove, Reynolds rode in the front passenger seat; Dalton sat behind them. Dalton saw Reynolds remove a knife from the console area between the front seats and then put it back. The men parked the car in Franklin County near the place where Bousman's body was later found. Unlocking the trunk, Correll took from the victim, who was still unconscious, a class ring and a pocket watch. Dalton took a necklace and pocket change.

After pulling the man from the trunk, Correll kicked him four or five times in the face as he lay on the ground; Reynolds kicked him once or twice more. Dalton helped Correll drag their victim into the woods, where Correll produced the knife that Reynolds had found in the car and threw it into the man's body. Correll

withdrew the knife and gave it to Reynolds, who, Dalton asserted, merely scratched the victim's neck with it. Correll then hurled the knife into the man a second time, pulled it out again, gave it to Dalton, and told him "to get rid of it." The men departed in the victim's car; Dalton, at Correll's direction, threw the knife into water beneath a bridge. They rode around a while longer, then returned to Small's house. Correll sold the class ring later that morning for $10.

Rhonda Small testified that Correll came to her house shortly after 1:00 a.m. on August 11. He left on foot with Reynolds and Dalton between 2:00 and 2:30 a.m. and returned with them in a maroon car between 4:00 and 5:00 a.m. Correll took Small for a ride in the car, which he said belonged to his cousin. The next night Small heard that the automobile had been "torched." Correll told her "that he had killed a faggot for the car." After talking to Reynolds, however, Correll assured Small that he had not killed anyone for it.

Connie Bryant, who was with Small on August 11, testified that Correll arrived at Small's house in the early morning hours in a "brand-new burgundy looking car" with the license "LOVE-69." It was stipulated that Bousman was the owner of a 1985 Buick Somerset, maroon in color, bearing the license "LOVE-69," in which he always carried a hunting knife with a four- to five-inch blade. It was further stipulated that on August 10 Bousman possessed, among other items, a class ring, a gold pocket watch, and a gold necklace.

Lonnie Reynolds, brother of Richard Reynolds, testified that he, Richard, and Correll were walking past a burning car one night in the middle of August when Correll became nervous and began relating how he, Dalton, and Richard had acquired that car. According to Lonnie, Correll said,

"I choked the guy and put him in the trunk . . . . I drug the guy out of the car and commenced stomping his face into a rock . . . . I took a knife and threw it into his chest twice and stabbed him . . . . I handed the knife to Richard and Richard cut him on the side of the neck and then Richard gave the knife to John Dalton and he threw the knife away."

Investigator W. Q. Overton, Jr., of the Franklin County Sheriff's Department testified that, during questioning, Correll con-

fessed to the killing, stating that he had stabbed Bousman twice. In prior responses to questioning, however, Correll had denied throwing the knife more than once, insisting that Reynolds and Dalton had each thrown the knife into Bousman one time.

Correll's defense consisted of Overton's testimony, based upon his investigation, that Bousman was alive as late as midnight and' the testimony of four other witnesses who accounted for Correll's whereabouts from midnight until 1:30 a.m., at 2:00 a.m., about 3:00 or 3:15 a.m., and sometime between 4:00 and 4:30 a.m.

## II. THE GUILT PHASE

During the questioning which followed Correll's arrest in Roanoke on August 16, Correll invoked his right to counsel[1] but said he could not afford to hire a lawyer. No lawyer was immediately appointed for him, but discussions continued between Correll and the police. Statements he made on August 16 and 17 were not offered in evidence.

On the morning of August 18, Correll was taken to Appomattox for a polygraph test and was returned later that day to the Franklin County jail. Investigator Overton went to the jail where Correll was in a holding cell. Overton, who was unaware that Correll had requested an attorney while he was incarcerated in Roanoke, testified that Correll told him that he wanted to talk to him. While Overton was taking Correll across the street to his office, Correll said that he wanted "to explain some things about the polygraph test." Overton told Correll not to say anything until his statement could be recorded. When they reached Overton's office, a recorder was activated. Overton read the warnings required under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and Correll executed a waiver. Correll then confessed to involvement in the robbery and killing of Bousman, insisting, however, that he had stabbed Bousman only once. The recorder was turned off as Overton prepared to leave when, according to the officer, Correll sud-

---

[1] At a pretrial suppression hearing, the Commonwealth put on evidence designed to show that Correll had not asserted his right to counsel or that his assertion of the right was ambiguous. The court initially ruled in the Commonwealth's favor, indicating that it would admit statements made by Correll to the police on August 16 and 17. At trial, however, the court stated, without objection, that it had ruled these statements inadmissible, finding that Correll had invoked his right to have an attorney present during questioning. This unchallenged ruling became the law of the case, and we are therefore bound by the trial court's finding that Correll had asserted his right to counsel.

denly changed his story, admitting for the first time that he had stabbed Bousman twice. The recorder was again activated; Correll stated that he had thrown the knife twice, then demanded that the interview be terminated.

The court questioned Overton closely about his conversation with Correll which led to this confession. Overton unequivocally denied having initiated any conversation with Correll until, after Correll had expressed the desire to talk to him, the officer escorted him to the investigation office and took charge.

Correll disputed Overton's account of the events that took place at the holding cell, insisting that he had repeatedly asked to call his parents. According to Correll, Overton came in and said he had to take him over to the sheriff's office but did not tell him why. Overton allegedly said Correll could make a telephone call after being returned to the jail. On the way to the sheriff's office across the street, Correll told Overton he could explain the polygraph results. The court admitted the confession in its entirety after engaging in the following colloquy with Correll:

When you left the jail with Mr. Overton, . . . he didn't initiate any conversation with you from the jail until you got over to the Sheriff's Office?

No, sir; he just said that I had to go over to the Sheriff's Office.

You said that you were going to explain to him or try to explain to him what was wrong or what went wrong with the polygraph over. in Appomattox; is that correct?

Yes, sir.

Then you went up into a room?

Yes, sir.

And he advised you of your Miranda Warnings and you signed the Miranda Waiver, is that correct?

Yes, sir.

Then you gave a statement; is that correct?

Yes, sir.

An accused has a right under the Fifth and Fourteenth Amendments to have counsel present during a custodial interrogation. *Edwards* v. *Arizona*, 451 U.S. 477, 482 (1981); *Miranda*, 384 U.S. at 474. In *Edwards*, the Supreme Court determined when interrogation may be resumed after the accused invokes his right to counsel:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights . . . . [A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85 (footnote omitted).

The rule of *Edwards* operates only where, as here, an accused has actually invoked the right to counsel. Once he has asserted this right, a waiver, to withstand constitutional challenge, must satisfy two distinct requirements. First, further discussions between the police and the accused must have been initiated by the accused. Second, the accused must have knowingly and intelligently waived his right to counsel. *Smith* v. *Illinois*, 469 U.S. 91, 95 (1984); *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1045-46 (1983); *Edwards*, 451 U.S. at 482-85. Correll's waiver meets both these tests.

In *Bradshaw*, four members of the Supreme Court found that an accused had initiated a "generalized discussion about the investigation" when he inquired, " 'Well, what is going to happen to me now?' " Acknowledging that certain inquiries, "such as a request for a drink of water or a request to use a telephone," are such a routine aspect of the custodial relationship that they do not begin "a more generalized discussion relating directly or indirectly to the investigation," the plurality found that the defendant's question was "not merely a necessary inquiry arising out of the incidents of the custodial relationship." 462 U.S. at 1045-46. The four dissenters in *Bradshaw* would have required that the defendant initiate "communication or dialogue *about the subject mat-*

*ter of the criminal investigation." Id.* at 1053 (emphasis in original).

■ It is apparent from the trial court's ruling that the court accepted as true Overton's account of the conversation leading to Correll's confession on August 18. Correll's statement that he wanted to explain the results of his polygraph test was clearly more than a statement arising from the incidents of the custodial relationship. Rather, it was a statement that "evinced a willingness and a desire for a generalized discussion about the investigation." *Id.* at 1045-46; *see Pittman v. Black,* 764 F.2d 545, 547 (8th Cir.), *cert. denied,* 474 U.S. 982 (1985) (defendant initiated discussions by asking officers if it appeared he was being blamed by other suspects); *United States v. Obregon,* 748 F.2d 1371, 1380-81 (10th Cir. 1984) (communications initiated by defendant who asked agent what would happen to him if he told the agent what she wanted to know); *United States v. Pearson,* 746 F.2d 787, 792-93 (11th Cir. 1984) (defendant who asked agent about what items had been seized in executing search warrant initiated discussions); *United States v. Kroesser,* 731 F.2d 1509, 1520 (11th Cir. 1984) (defendant's expression of regret, voiced during fingerprinting, that he had involved a codefendant in criminal activity initiated discussions about the investigation). Indeed, Correll's statement falls within the ambit of the standard favored by the *Bradshaw* dissenters, as well as that laid down by the plurality, because it related directly to the subject matter of the investigation.

■ The trial court made a finding of fact that Correll initiated the discussions which led to his confession. This finding is amply supported by the evidence, and we will not disturb it. *See Watkins v. Commonwealth,* 229 Va. 469, 477, 331 S.E.2d 422, 429-30 (1985), *cert. denied,* 475 U.S. 1099 (1986).

Correll contends that his conversation with Overton on August 18 was nothing more than an extension of the interrogation that began that morning when he was, without counsel present, taken to Appomattox for a polygraph test. We find no merit in this argument. The polygraph questioning session had been concluded and Correll had been transported to Franklin County, where he was to be held and ultimately to be tried. At the time he indicated his desire to talk to Overton, he was not being subjected to questioning; rather, he was merely being confined in a holding cell. Conversation with Overton came about purely at Correll's request.

■ To be admissible, however, Correll's statement must not only have resulted from dialogue initiated by him but must also have followed a waiver that was knowingly and intelligently given. His waiver must be evaluated in view of the totality of the circumstances, including his background and experience and the conduct of the police.[2] *See Bradshaw*, 462 U.S. at 1046; *Edwards*, 451 U.S. at 482, 486 n.9; *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

Correll had been given *Miranda* warnings on several occasions between his arrest on August 16 and his statement to Overton on August 18. Before Overton took Correll's statement, he again advised him of his Fifth Amendment rights. Correll executed a waiver-of-rights form. When Correll changed his story in the course of his statement, Overton repeated the advice of rights, after which Correll confessed to stabbing Bousman twice.

■ Despite his low IQ of 68, Correll had on a number of prior occasions dealt with the police and received *Miranda* warnings. He was capable of effecting a valid waiver. *See Simpson v. Commonwealth*, 227 Va. 557, 564, 318 S.E.2d 386, 390 (1984) (defendant with IQ of 78 but with good "street sense" was capable of understanding his rights and intelligently waiving them); *see also United States v. Glover*, 596 F.2d 857, 866 (9th Cir.), *cert. denied*, 444 U.S. 860 (1979) (waiver valid because of defendant's prior experience with police even though his IQ of 67 was in bottom one percentile of society); *People v. Williams*, 62 N.Y.2d 285, 288-89, 465 N.E.2d 327, 328-29, 476 N.Y.S.2d 788, 789-90 (1984) (defendant who understood immediate import of *Miranda* warnings but who was unable, due to mental and physical disabilities, to understand the full legal implications of confessing could nonetheless make an effective waiver).

■ We hold that, under the totality of the circumstances, Correll made a knowing and intelligent waiver of his right to counsel. Thus, the court properly admitted his incriminating statement.

Code § 18.2-31(d) defines as capital murder the "willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon." Correll contends that the evidence fails to show that he committed the underlying

---

[2] The conduct of the police is not in issue because at no time in the trial or appeal of this case has the defense contended that the police used coercive techniques to elicit Correll's confession.

offense. Rather, he says, any robbery had already occurred before he became armed with a deadly weapon. We disagree.

It is true that, when the robbery began, Correll was unarmed. He rendered his victim helpless by physical force, then took from his person what items of value could be found. But the robbery did not end there. After the beating and stabbing of Bousman with the knife removed from his car, the men fled the scene in the car they had earlier commandeered. Only at this point was the taking of the car consummated and the robbery completed, and Correll was clearly armed with the knife during the commission of a portion of the robbery. *See Linwood Earl Briley v. Commonwealth*, 221 Va. 532, 543-44, 273 S.E.2d 48, 55 (1980), *cert. denied*, 451 U.S. 1031 (1981). The predicate offense to capital murder was established by the evidence.

Prior to trial, Correll sought and the court ordered discovery of exculpatory evidence under *Brady* v. *Maryland*, 373 U.S. 83 (1963). During the sentencing hearing that followed Correll's conviction, the Commonwealth's attorney revealed that he had failed to disclose a petit larceny conviction of the prosecution's chief witness, Dalton. Correll moved for a mistrial, but the court, stating that the conviction had "absolutely no effect" on its decision, denied the motion.

The undisclosed criminal conviction was "evidence favorable to [the] accused" within the *Brady* rule, 373 U.S. at 87, because the defense could have used it for impeachment purposes. *See United States* v. *Bagley*, 473 U.S. 667, 676 (1985); *Giglio* v. *United States*, 405 U.S. 150, 154 (1972). The nondisclosure of such evidence, however, requires reversal "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678; *Robinson* v. *Commonwealth*, 231 Va. 142, 151, 341 S.E.2d 159, 164 (1986). Evidence is material in this sense "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682 (majority opinion); *see id.* at 685 (concurring opinion).

Failure to disclose Dalton's petit larceny conviction did not deprive Correll of the opportunity to discredit Dalton's testimony through cross-examination. Upon questioning by defense counsel, Dalton acknowledged facts that tended to show his interest or

bias: he was testifying under a plea agreement with the Commonwealth, and he and Reynolds were good friends.[3] The additional impeachment value of a petit larceny conviction, in view of this evidence of interest and bias, was negligible. Moreover, the trial judge was the trier of fact and, upon learning of the undisclosed information, stated unequivocally that the criminal conviction would have had no impact on his finding of Correll's guilt. The undisclosed conviction of Dalton does not rise to the level of materiality announced in *Bagley* and adopted in *Robinson*, and the court did not abuse its discretion in denying Correll's motion for a mistrial.

## III.  THE PENALTY PHASE

At the close of the first phase of the trial, the court, after pronouncing its guilty verdict, directed that a presentence report be prepared. At another hearing prior to the penalty phase of the trial, the court outlined the procedure it would follow at the sentencing hearing, indicating it would receive the presentence report. After the court sentenced Correll to death, the defense filed a written motion for a post-sentence report pursuant to Code § 19.2-264.5.[4] The court denied this motion, ruling that receipt of a presentence report complies with Code requirements for sentencing in a non-jury capital case.

While § 19.2-264.5 does not expressly restrict its post-sentence report requirement to jury cases, we believe such a restriction is implicit in its language. The provision clearly contemplates a situation in which a fact finder first fixes punishment, then the trial court imposes sentence. Such a sequence generally does not occur in bench trials, in which the fact finder and the sentencer are the same entity, the trial judge. Where no presentence report is received in a bench trial, § 19.2-264.5 re-

---

[3] He also responded to questioning concerning the interest and bias of other prosecution witnesses.

[4] Code § 19.2-264.5 provides:

When the punishment of any person has been fixed at death, the court shall, before imposing sentence, direct a probation officer of the court to thoroughly investigate upon the history of the defendant and any and all other relevant facts, to the end that the court may be fully advised as to whether the sentence of death is appropriate and just. . . . After consideration of the report, and upon good cause shown, the court may set aside the sentence of death and impose a sentence of imprisonment for life.

quires the court to consider a post-sentence report before imposing the death penalty. *See Edmonds* v. *Commonwealth*, 229 Va. 303, 313, 329 S.E.2d 807, 814, *cert. denied*, 474 U.S. 975 (1985). However, in a case such as the one now before us, the tenor of § 19.2-264.5 is complied with and no prejudice results to the defendant where the trial judge considers a presentence report in conjunction with the evidence adduced in the sentencing hearing and, in a single step, fixes and imposes a sentence of death. Accordingly, we hold that the trial court did not err in ruling that a post-sentence report was not required.

In the sentencing phase of the trial, the Commonwealth sought to have the death penalty imposed upon either a finding of Correll's future dangerousness or a finding of the vileness of the crime, or both. The presentence report detailed the circumstances of the offense, Correll's criminal history, and his family, education, and employment background. A report of a psychologist at Central State Hospital showed he had scored 68 on an IQ test, placing him in "a category between mild mental retardation and low average intelligence."

The defense elicited testimony from Correll's father, two former foster parents, two social workers, a psychiatrist, two prison officials, and one other acquaintance of Correll. Their evidence showed that Correll had suffered from a serious disease as an infant and had grown up in a poor home environment. Because his mother could not cope with his behavior, his parents had requested that he be placed in foster care. He was first placed in a foster home at the age of eight. Either because of his behavior or because of his health, he did not start school until he was nine. Correll's behavior was uncontrolled, disruptive, and antisocial when he lived at home and when he abused drugs and alcohol. In foster care or in the controlled environment of the prison system, however, his behavior was good.

At the close of the evidence, the court sentenced Correll to death solely on the basis of the vileness of the crime. The court expressly noted that it had considered all the evidence in mitigation of the offense.

Correll challenges the court's finding of vileness, saying it was not supported by the evidence. The "vileness" predicate to a sentence of death requires a finding that the murder "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim."

Code § 19.2-264.2. The trial court found both an aggravated battery and depravity of mind, and both findings are amply supported by the record.

The murder of Bousman was clearly an aggravated battery, one "which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith*, 219 Va. at 478, 248 S.E.2d at 149. Correll choked his victim, kicked him repeatedly, and finally inflicted two knife wounds, either of which could ultimately have resulted in death. These acts exceeded the minimum necessary to accomplish Bousman's murder. *See Boggs* v. *Commonwealth*, 229 Va. 501, 521, 331 S.E.2d 407, 421 (1985), *cert. denied*, 475 U.S. 1031 (1986) (number and nature of batteries inflicted on victim is essence of test of aggravated battery).

Moreover, Correll's conduct revealed his horrifying depravity of mind, "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation." *Smith*, 219 Va. at 478, 248 S.E.2d at 149. Only an evil, distorted imagination could have conceived the villainous plan to kill Bousman by using his prostrate body as a target for knife-throwing. *See Jones* v. *Commonwealth*, 228 Va. 427, 448, 323 S.E.2d 554, 565 (1984), *cert. denied*, 472 U.S. 1012 (1985) (aggravated battery committed on a corpse or unconscious body demonstrates depravity of mind).

Correll also contends that the trial court disregarded the mitigating evidence and arbitrarily imposed the death penalty. He says the evidence in mitigation was of such weight that the court could not have considered it and sentenced him to death. We do not agree. The mitigating evidence, which we have reviewed in its entirety, tended to negate future dangerousness so long as Correll remained in confinement, but the trial court eliminated future dangerousness as a basis for imposition of the death sentence. The evidence also demonstrated that Correll had experienced an unfortunate home situation and troubled childhood. While this evidence was mitigating in that it showed "extenuating circumstances tending to explain, but not excuse, his commission of the crime," *Coppola* v. *Commonwealth*, 220 Va. 243, 253, 257 S.E.2d 797, 804 (1979), *cert. denied*, 444 U.S. 1103 (1980), it did not require as a matter of law that the death penalty not be imposed in this case. It was the fact finder's duty to consider this evidence with the other evidence in determining the appropriate

sentence. The fact finder was not required to give controlling effect to the mitigating evidence. Having reviewed the sentence as required by Code § 17-110.1(C)(1), we hold that the court imposed the death penalty without the influence of passion, prejudice, or other arbitrary factor.

We also are required, under Code § 17-110.1(C)(2), to determine if the sentence of death is excessive or disproportionate to sentences imposed in similar cases. Comparing this case with other capital-murder cases, we have focused primarily on those in which the sentences of death were based on the vileness of the crime.[5] Having reviewed the records in all the capital cases presented to this Court under the current capital-murder statutes, including those in which life sentences were imposed, we hold that Correll's sentence is not excessive or disproportionate to the sentences generally imposed in the Commonwealth for crimes comparable to his murder of Bousman. *See, e.g., Boggs*, 229 Va. at 505-09, 521-22, 331 S.E.2d at 411-14, 421-22; *Coppola*, 220 Va. at 246-47, 256-59, 257 S.E.2d at 800, 806-08.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

By separate counsel, appointed to raise claims of ineffective assistance of counsel,[6] Correll mounts several attacks on the effectiveness of the trial counsel. He says that counsel's failure to object to the court's plan to consider a presentence report was prejudicial in the sentencing phase because it allowed the court to consider damaging evidence about his criminal past in fixing sentence, rather than giving him one opportunity to convince the court, before it saw the report, to sentence him to life imprisonment. Nothing contained in the report was inadmissible in the sentencing phase; indeed, much of the information in the report was revealed by the testimony. As we have held that the

---

[5] *See, e.g., Wise* v. *Commonwealth*, 230 Va. 322, 337 S.E.2d 715 (1985), *cert. denied*, 475 U.S. ____, 106 S.Ct. 1524 (1986); *Boggs* v. *Commonwealth*, 229 Va. 501, 331 S.E.2d 407 (1985), *cert. denied*, 475 U.S. 1031 (1986); *Washington* v. *Commonwealth*, 228 Va. 535, 323 S.E.2d 577 (1984), *cert. denied*, 471 U.S. 1111 (1985); *Jones* v. *Commonwealth*, 228 Va. 427, 323 S.E.2d 554 (1984), *cert. denied*, 472 U.S. 1012 (1985); *see also* cases cited in *Jones*, 228 Va. at 450-51 n.3, 323 S.E.2d at 567 n.3.

[6] Code § 19.2-317.1 provides:

A claim of ineffective assistance of counsel may be raised on direct appeal if assigned as error and if all matters relating to such issue are fully contained within the record of the trial.

presentence report was admissible, counsel were under no duty to object to its admission. Correll also asserts that the failure to object to the court's departure from the sentencing scheme of Code § 19.2-264.5 prejudiced his rights on appeal. Here again, counsel's failure to object is irrelevant in view of our ruling that consideration of a presentence report satisfies the statutory requirements in a bench trial. Accordingly, we find no merit in these assertions of ineffectiveness.

Correll further contends that trial counsel were ineffective in failing to seek a continuance based on Correll's inability to assist in his own defense. He relies on a portion of argument at the sentencing hearing in which counsel informed the court that, whenever they attempted to discuss with Correll the crime or Correll's confession, Correll "just went into a shell, he would curl up in the corner and he would cry and it did get frustrating." And, finally, Correll says counsel were ineffective in failing to seek a neurological examination in view of the evidence that a physical disability may have contributed to his behavior. The Commonwealth responds that these two issues cannot be resolved on the record from the trial court. We agree.

A convicted defendant must show that, in light of all the circumstances, the challenged performance of counsel fell below the standard of reasonableness. *Strickland* v. *Washington*, 466 U.S. 668, 690 (1984); *Frye* v. *Commonwealth*, 231 Va. 370, 400, 345 S.E.2d 267, 287-88 (1986). Moreover, the defendant must show that counsel's deficient performance was prejudicial; he must demonstrate a reasonable probability that, absent counsel's error, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

Upon the record before us, we cannot determine as a matter of law that the challenged omissions by trial counsel concerning a continuance and a neurological examination were either unreasonable or prejudicial. As a general rule, unless counsel charged with ineffectiveness has had an opportunity to defend himself on the record by giving the rationale for his challenged acts of omission or commission, we will not consider the issue on direct appeal. *See Beaver* v. *Commonwealth*, 232 Va. 521, 537, 352 S.E.2d 342, 351 (1987) (this day decided). An attack upon an attorney's competence is not to be taken lightly. Although we acknowledge the possibility that errors so egregious as to preclude explanation may appear in the record of some future appeal, this

is not such a case. Accordingly, we do not reach the merits of Correll's claims of ineffectiveness concerning a continuance and a neurological examination.

Finding no error in the trial of these cases and in the imposition of the death sentence, we will affirm the judgments.

*Record No. 860566 - Affirmed.*
*Record No. 860567 - Affirmed.*