**Alexandria**

ROBERT LYNN CURTIS

v.

COMMONWEALTH OF VIRGINIA

No. 0958-85

Decided February 3, 1987

COUNSEL

R. Ramsey Maupin (Maupin & Ornitz, on brief), for appellant.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**MOON, J.** —Robert Lynn Curtis appeals his convictions of two counts of rape, two counts of sodomy, and burglary. He contends that the trial judge erred: (1) in admitting evidence of other similar crimes committed by Curtis; and (2) by allowing the Commonwealth's attorney during closing argument to use a chart depicting the similarities between the present crimes and the other similar crimes. Finding no reversible error, we affirm the convictions.

Lynn, the victim in this case, was awakened at approximately 4:00 a.m. on November 20, 1983, by a man standing in her bed-

room. He placed a pillow over her face, sodomized her and raped her. He then smoked a cigarette and repeated the acts of sodomy and rape. Upon being shown a photo spread, Lynn was unable to positively identify Curtis as her attacker, but she was able to identify him in court. The Commonwealth also tried to prove Curtis was Lynn's attacker by showing that he committed two other crimes with significant unusual characteristics similar to this crime.

Evidence of other crimes committed by a defendant is generally not admissible and is reversible error. *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970); *Johnson v. Commonwealth*, 3 Va. App. 444, 448, 350 S.E.2d 673, 674-75 (1986); *Sutphin v. Commonwealth*, 1 Va. App. 241, 245, 337 S.E.2d 897, 899 (1985).

> [B]ut if such evidence tends to prove any other relevant fact of the offense charged, and is otherwise admissible, it will not be excluded merely because it also shows him to have been guilty of another crime.

*Williams v. Commonwealth*, 203 Va. 837, 841, 127 S.E.2d 423, 426 (1962) (quoting *Day v. Commonwealth*, 196 Va. 907, 914, 86 S.E.2d 23, 26 (1955)). One basis for admitting evidence of other crimes is to prove the identity of the criminal. *United States v. Woods*, 484 F.2d 127, 133-35 (4th Cir. 1973), *cert. denied*, 415 U.S. 979 (1974); *Huffman v. Commonwealth*, 168 Va. 668, 683-84, 190 S.E. 265, 272 (1937). The defendant's identity as the person who committed the other crimes, because of their unusual characteristics and similarities to the crime for which the defendant is on trial, creates an inference that he or she also committed the crime on trial. *See* Annot., 2 A.L.R.4th 330 (1980).

In order for evidence of other crimes to be admitted, even on the issue of identity, the probative value of such evidence must outweigh any incidental prejudice to the accused. *Hawks v. Commonwealth*, 228 Va. 244, 247, 321 S.E.2d 650, 652 (1984). To be probative, "the manner in which the crime was committed . . . must be so unusual and distinctive as to act as a signature." *Johnson*, 3 Va. App. at 448, 350 S.E.2d at 675; *Sutphin*, 1 Va. App. at 247, 337 S.E.2d at 900. With regard to whether the probative value outweighed the prejudice, the "responsibility for balancing these competing considerations is largely within the sound discre-

tion of the trial judge." *Coe v. Commonwealth*, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986).

In this case, Curtis denied that he was the perpetrator of the crimes and Lynn originally was unable to pick him out of an array of photographs, although she narrowed her choices down to Curtis and one other individual. When she next saw Curtis, he was in court being tried for one of the similar crimes he had committed against another victim. Lynn identified him at that point as her assailant.[1] At the trial of this case, defense counsel attempted to discredit Lynn's identification of Curtis as her assailant. The Commonwealth then properly sought to corroborate her identification testimony. For the reasons set forth below, we hold that the Commonwealth's use of evidence of the other crimes to prove identity was appropriate and that the trial court did not abuse its discretion in admitting the evidence. *Id.*

Lynn, the victim in this case, was raped in her apartment on November 20, 1983. Victim 2 was raped on March 18, 1984, in the same apartment Lynn had lived in the previous year. Curtis attempted to rape Victim 3 on June 30, 1984, three blocks from the scene of the other assaults, but the police interrupted Curtis and arrested him. Thus, the evidence showed beyond question that he attempted to rape Victim 3. The question is whether he also raped Lynn and Victim 2.

Curtis and the person or persons who raped Lynn and Victim 2 shared several similar characteristics. Curtis is a thin, white male, with curly hair, 5'6" tall, who speaks with a "country" accent. Both Lynn and Victim 2 testified that their assailant used bad grammar and spoke with a strong southern accent. Upon hearing Curtis speak at trial, both stated that he sounded very similar to their assailant. Lynn described her assailant to the police as a white male in his twenties, thin, with curly blonde hair, and approximately 5'8" tall. Victim 2 testified that her assailant was in his twenties, thin, and estimated his height to be 5'5" to 5'6". Victim 2 did not see her assailant's hair.

Amy Wong, a forensic analyst with the Virginia Bureau of Forensic Science, analyzed evidence taken from the bedrooms of the

---

[1] On this appeal, Curtis does not challenge Lynn's in-court identification of him as her assailant at the trial for her rape.

two victims and material sent in their PERK[2] kits. Ms. Wong testified that, under the ABO blood grouping system, the assailant of both Lynn and Victim 2 was a Type O secretor. Forty-five percent of the population have Type O blood, and characteristics of a person's blood type are present in eighty percent of the population's other body fluids. The other twenty percent are termed nonsecretors. Curtis is a Type O secretor. Secretions found on Lynn's sheets and a semen stain on her t-shirt were Type O, consistent with the secretions of Curtis. In addition, Ms. Wong testified that four pubic hairs recovered from Lynn's bed were consistent with Curtis' hair type, and inconsistent with Lynn's.

In analyzing evidence from Victim 2's PERK kit, Ms. Wong stated that she found Type O seminal fluid on a clipping of Victim 2's pubic hair. Both head and pubic hair were recovered from Victim 2's sheets which were consistent with Curtis' hair type. Ms. Wong also found spermatozoa present in a vaginal swab sample taken from Victim 2 which indicated the secretions were Type O. In addition, Ms. Wong performed a PGM, or enzyme, analysis on the fluid from the vaginal swab. The fluid is characterized as either PGM-1, PGM-2, or PGM-21. Victim 2's swab indicated the presence of PGM-21 fluid. Victim 2 is a PGM-1 secretor and Curtis is a PGM-2 secretor. Significantly, only six percent of the population are PGM-2 secretors, fifty-eight percent are PGM-1, and thirty-six percent are PGM-21. The forensic analyst explained that the combination of fluid from two persons such as Victim 2 and Curtis, one a PGM-1 secretor and one a PGM-2 secretor, will produce a PGM typing of PGM-21. PGM analysis on the secretions included in Lynn's PERK kit was inconclusive. Nevertheless, the physical traits alone of Curtis and Victim 2's assailant placed Curtis in a small percentage of the population who could have raped Victim 2. This evidence, along with Victim 2's identification of Curtis as her assailant, was sufficient for the jury to believe that Curtis raped Victim 2. Likewise, the physical traits of Curtis and Lynn's assailant were significantly identical so as to be circumstantial evidence consistent with guilt and inconsistent with innocence.

---

[2] In the investigation of a sexual assault, a physical evidence recovery kit (PERK) is prepared for laboratory analysis, obtaining samples of head and pubic hairs, blood, vaginal and oral swabs, and other physical evidence from the victim.

There were other aspects of these crimes which further identified Curtis as the assailant of all three women. First, all three assaults occurred between 2:00 a.m. and 4:00 a.m. on weekends: Lynn was raped between 3:55 and 4:35 a.m. on a Sunday; Victim 2 was raped between 2:00 a.m. and 3:15 a.m. on a Saturday; and Victim 3 was attacked on a Saturday around 4:00 a.m. In each instance, the assailant entered through a window. In each instance, he stood before his victim and, when she awakened, put a pillow over her face to keep her quiet. In each instance, the victims testified that their assailant told them that they had a "nice ass." Lynn and Victim 2 both testified he used the phrase: "You have a nice ass." Victim 3 testified that Curtis said: "You have nice buns, ass or similar words." The assailant of all three women also used the expression: "Shut the fuck up." Curtis told Victim 3: "Shut the fuck up. I'll rip your face off." Lynn's and Victim 2's assailant stated: "Shut the fuck up or I will kill you." Curtis said to Victim 3: "God I don't know what got into me last night." The assailant of both Lynn and Victim 2, after raping them, stated: "Do you think that God will hate me" and "Do you think I am going to hell." Also, Lynn's and Victim 2's assailant both asked whether the sodomy and rape felt good.

In each case, before the rape or attempted rape, the assailant sodomized or attempted to sodomize the victim. Officer C. W. Crouch, an Arlington County police officer for twenty-five years, testified that an assailant's commission of "oral sodomy and then vaginal intercourse," was a "great similarity" in Lynn's and Victim 2's cases, distinguishing it from other rape cases.

Further proof that the person who raped Victim 2 also raped Lynn was the assailant's commands to the victims not to move as he left. The assailant told Lynn not to call the police, stating: "They can get here fast and I'll be outside and I'll see them and I'll come back and kill you." He told her not to move for fifteen minutes. Victim 2's assailant also told her she had better not call anybody or he would come back and kill her. He also stated: "If you call the police I'm going to be watching and I'm going to see. I can watch and I can hear them. They get here real fast." Both Lynn's and Victim 2's assailant pretended to leave and then came back to be sure that the victim was obeying his instructions.

We hold that, based upon the overwhelming similarities between the three crimes and the distinctive manner in which they

were committed, the trial judge did not abuse his discretion in admitting the evidence of the crimes against Victim 2 and Victim 3 because they were highly probative on the issue of the identity of the person who committed the crimes against Lynn.

■ Next, we turn to Curtis' contention that the court erred in allowing the Commonwealth's attorney, in his argument before the jury, to use a chart setting forth the similarities of the three crimes. The use of charts lies within the sound discretion of the trial judge, who is allowed very considerable latitude with respect to the substance and form of the parties' presentation of the case. *See Draper v. Commonwealth*, 132 Va. 648, 667, 111 S.E. 471, 477 (1922). "Argument by means of illustration, such as exhibiting to the jury models, tools, weapons, implements, etc., is a matter of every day practice." *Peoples v. Commonwealth*, 147 Va. 692, 705, 137 S.E. 603, 607 (1927); *see also Certified T.V. & Appliance Co. v. Harrington*, 201 Va. 109, 115, 109 S.E.2d 126, 130 (1959) (in which the Supreme Court stated that it was not error for counsel, during closing argument, to use a blackboard upon which counsel placed figures which were supported by the evidence). Given the difficulty the jury may have in understanding complicated sets of facts merely through oral presentation, the use of illustrations should in no way be discouraged by the court.

> Counsel for both sides should be encouraged to present their case in a way that will be most clearly understood by the jury. The extent to which visual aids can be used . . . rests within the sound discretion of the trial court.

*Campbell v. Menze Construction Co.*, 15 Mich. App. 407, ___, 166 N.W.2d 624, 626 (1968).

The closing argument is not evidence, which the jury was properly told in this case, and thus it was immaterial that the chart was not introduced into evidence at trial. The chart represented merely a recitation in an orderly form of the similarities between the three crimes. There was nothing in the chart which was not supported by evidence in this case. Therefore, the chart did not exceed what counsel could have argued to the jury without its use. Of course, such charts and diagrams must not be misleading, and we do not find the chart in this case to have been so. Therefore,

the judgment is affirmed.

*Affirmed.*

Duff, J., and Keenan, J., concurred.