# Tony Albert Mackall

## V.

# Commonwealth of Virginia

Record Nos. 880068 and 880069

September 23, 1988

Present: All the Justices

*Ronald Wayne Fahy; Frederick A. Edwards*, for appellant.
*Richard A. Conway, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

WHITING, J., delivered the opinion of the Court.

Tony Albert Mackall was indicted and tried for capital murder in the commission of robbery while armed with a deadly weapon, Code § 18.2-31(d), and for robbery and the display of a firearm in a threatening manner. A jury convicted Mackall of all three crimes and fixed his punishment at life imprisonment on the robbery charge and two years' confinement on the firearm charge. In the second phase of the bifurcated trial on the capital murder charge, the jury heard evidence of aggravating and mitigating circumstances and fixed Mackall's sentence at death, based on his future dangerousness. *See* Code § 19.2-264.4. After a sentencing hearing required by Code § 19.2-264.5, the trial court confirmed the death sentence fixed by the jury on the capital murder charge and, on December 18, 1987, entered judgment on all three convictions.

Mackall appealed his convictions for robbery and the use of a firearm in the commission of a felony to the Court of Appeals. We certified those cases to this Court pursuant to Code § 17-116.06 and consolidated them with the automatic review of Mackall's death sentence and his appeal from the conviction of capital murder. Code §§ 17-110.1(A) and -110.1(F).

### FACTS

Under familiar principles, we consider the facts in the light most favorable to the Commonwealth.

On December 9, 1986, the victim, Mary E. Dahn, was working as a cashier at the Riverview Shell Service Station on Jefferson Davis Highway in Prince William County. Her husband, Stephen

Dahn, the manager of the station, was on a ladder hanging Christmas lights at the front of the station. Their daughters April and Julie, ages five and six, were also present, "in and out" of the station.

About 6:00 p.m., Mrs. Dahn was in the cashier's booth when her husband heard a muffled shot. He immediately looked down and saw someone's hands in the cash drawer. Dahn jumped off the ladder and ran toward the cashier's booth. A young black man Dahn later identified as Mackall emerged from the booth carrying a gun in his hand. When Dahn saw the gun, he ran behind the booth, fell to the ground and heard another shot. Dahn got up and entered the cashier's booth where he found his wife lying unconscious on the floor, and he noticed that the cash drawer was open and all the paper money had been removed. A later count revealed that $515 was missing. Mrs. Dahn was taken to the hospital where she died the next day, apparently without regaining consciousness.

April Dahn testified that she saw a masked black man shoot her mother in the head, then run away. Afterward, April picked up some one and five dollar bills from the ground.

Ernestine Huntley, who lived near the gas station, heard a shot between 6:30 and 7:00 p.m. and saw a young black male running to the back of the filling station. She saw him trying to start a sedan and when he finally got it started, Huntley noticed that its lights kept flashing off and on.

Jacqueline S. Leonard, a Prince William County policewoman, later discovered the sedan Mackall had driven from the scene abandoned in woods near an interstate highway interchange about one-half mile from the filling station. Mackall's fingerprints were later found on a visor mirror in the sedan.

At 7:00 p.m. that evening, approximately 250 yards from where Leonard found the car, Mackall accosted Michael P. Keating at an apartment and took his car keys and his wallet at pistol point. After starting Keating's car, Mackall returned to the apartment where he had left Keating. Despite Keating's plea not to shoot him, Mackall placed the barrel of his gun against Keating's head and shot him once. When Keating fell to the floor, Mackall ordered Keating to get up and shot him again in the head at a range of three feet. Keating fell again but did not get up until he thought Mackall had left the apartment because, he testified, "I was afraid he would shoot me again. After the first shot I knew

the only reason he fired the second shot was because I was still alive."

Mackall admitted to Michael Lee Randolph, a fellow inmate in jail, that he had robbed and shot Mrs. Dahn and Keating. Mackall told Randolph that the lady deserved to be shot in the head because she was fighting for the money after he got it in his hands.

## I.

## PRE-TRIAL MATTERS

### A. Suppression Motions

■ (1) *Seizure of Gun.* Mackall contends that the gun, identified by ballistics experts as of the same caliber as the bullet removed from Mrs. Dahn's body, was seized in his mother's home in violation of his Fourth Amendment rights and, therefore, it should not have been introduced in evidence. He claims that his mother did not execute the written consent to search her home until the police had completed the search. There was evidence, however, that she not only agreed to the search but signed the consent form before the police found the gun. Therefore, Mackall is bound by the trial court's factual finding that her consent to search was given before the police found the gun.

■ We need not decide whether Mackall had a legitimate expectation of privacy in the closet in his mother's house. The consent of his mother, who had at least a joint right of possession with Mackall, overrode Mackall's rights of privacy, if any, in the closet. *O'Dell* v. *Commonwealth*, 234 Va. 672, 682, 364 S.E.2d 491, 496 (1988).

(2) *Presence of Counsel at Post-Line-up Police Interviews of Identifying Witnesses.* Mackall claims that although his counsel were present during a line-up, they were unconstitutionally excluded from the post-line-up police interviews of identifying witnesses.[1]

■ Mackall had no constitutional right, however, to require his counsel's presence at the post-line-up police interviews of the identifying witnesses. We expressly rejected a claim that the Sixth Amendment required the presence of counsel during photographic

---

[1] We note Mackall's claim that the line-up was *after* the indictment; however, the line-up was conducted *before* Mackall was indicted.

line-ups in *Drewry v. Commonwealth*, 213 Va. 186, 189, 191 S.E.2d. 178, 180 (1972). Quoting Judge Friendly's opinion in *United States* v. *Bennett*, 409 F.2d 888 (2d Cir.), *cert. denied sub nom. Haywood* v. *United States*, 396 U.S. 852 (1969), we reiterated that nothing in the earlier Supreme Court cases "suggests that counsel must be present when the prosecution is interrogating witnesses in the defendant's absence." *Drewry*, 213 Va. at 189, 191 S.E.2d at 180-81.

■ Mackall also argues that his appearance at the preliminary hearing constituted another "line-up" and, therefore, required the exhibition of other men with similar physical characteristics. Mackall cites no supporting authority for this proposition, and we find none. By the time of the preliminary hearing, Mackall already had been identified in a properly conducted line-up. He had no right to demand another line-up.

We will uphold the trial court's rulings on the motions to suppress.

### B. Denial of Motion for Continuance and Further Psychiatric Examination

Mackall, an indigent, claims his due process rights were violated when the trial court refused to grant him a third continuance to permit another evaluation by a second psychiatrist at state expense. We find no merit in this claim for three reasons.

■ First, Mackall was not entitled to select his examining psychiatrist if the state was paying for the examination. *Ake* v. *Oklahoma*, 470 U.S. 68, 83 (1985); *Gray* v. *Commonwealth*, 233 Va. 313, 329, 356 S.E.2d 157, 166, *cert. denied*, 484 U.S. ____, 108 S.Ct. 2097 (1987). Second, Mackall was not entitled to a second psychiatric examination at state expense where the Commonwealth already had paid for his first examination. *Pruett* v. *Commonwealth*, 232 Va. 266, 275-76, 351 S.E.2d 1, 7 (1986), *cert. denied*, 482 U.S. 931 (1987); *see* Code § 19.2-264.3:1(A).

■ Third, whether a further continuance should have been granted was a matter within the sound discretion of the trial court, and we find no abuse of discretion. On April 10, 1987, upon Mackall's motion filed four days earlier, the trial court appointed Dr. R. Jackson Dykes, a psychiatrist, to evaluate Mackall and assist him in his defense in conformity with the requirements of Code § 19.2-264.3:1 and *Ake*. Mackall's motion sought psychiat-

ric assistance to evaluate his sanity and, if appropriate, to assist in developing an insanity defense. At that time, the case was set for trial on July 14. On June 5, on Mackall's subsequent motion, the trial court expanded the scope of Dr. Dyke's examination to include assistance to the defense in preparing and presenting information of Mackall's history, character, and mental condition, pursuant to Code § 19.2-264.3:1. At Mackall's request, the trial court also postponed the trial date. On July 7, the court reset the case for trial beginning on October 13.

Because Mackall claimed to have no memory of the events on the day of Mrs. Dahn's murder, Dr. Dykes submitted only a partial report of his July 29 examination of Mackall to Mackall's counsel. On September 24, Mackall filed motions for a second continuance and for an additional evaluation at state expense by the forensic clinic at the University of Virginia because the clinic "has specialized techniques to overcome . . . memory problems." On September 25, the court denied both of Mackall's motions.

On October 2, Mackall told his counsel that he then remembered the events of the day of Mrs. Dahn's murder and discussed those events with his counsel. On October 7, counsel advised the court of this and moved for a supplemental examination in view of that information and for a further postponement of the trial. The court authorized Dr. Dykes to conduct a further examination and postponed the beginning date of the trial from October 13 to October 19 to permit Dr. Dykes to complete his report.

When Dr. Dykes examined Mackall again on October 8, Mackall advised Dr. Dykes what he remembered of the day of the murder. On October 14, Dr. Dykes furnished a supplemental report to Mackall's counsel.

On October 15, Mackall's counsel gave notice that he would move for a third continuance and that motion was heard on Friday morning, October 16. At the hearing, counsel for Mackall noted that they had not had an opportunity to meet with Dr. Dykes to discuss his supplemental report. The trial court read the supplemental report, found that the additional information did not justify a continuance to develop any defense or any matters in mitigation described in Code § 19.2-264.3:1 and, accordingly, denied the motion. On Monday morning, October 19, when the trial began, counsel for Mackall renewed their motion. By that time they had interviewed Dr. Dykes, yet they failed to advise the court

of any additional information the interview may have produced that justified a continuance.

■ A motion for a continuance is addressed to the sound discretion of the trial court, *Townes* v. *Commonwealth*, 234 Va. 307, 333, 362 S.E.2d 650, 664 (1987), *cert. denied*, 485 U.S. ____, 108 S.Ct. 1249 (1988), and we will not disturb the trial court's action in the absence of an abuse of discretion. We find no such abuse in this case. Mackall made no showing of a specific need for additional investigation to prepare either a defense or to present matters in mitigation.

## C. Denial of Motion of One of Defense Counsel to Withdraw

On October 7, 1987, Ronald W. Fahy, one of Mackall's counsel, moved to withdraw because of a potential conflict of interest. Fahy had represented Michael Lee Randolph (one of the Commonwealth's witnesses) in a previous case. We are not told when Fahy represented the witness, but only that his representation was for an unrelated matter and that Fahy apparently had forgotten his former representation until shortly before he made his motion to withdraw. Mackall contends that he did not waive this conflict of interest and that Fahy should have been permitted to withdraw. We disagree.

Because Fahy no longer represented the witness, the only possible effect his former representation might have had upon his representation of Mackall might have been a reticence in cross-examining the former client. But Frederick A. Edwards, III, co-counsel for Mackall, and not Fahy, cross-examined Randolph.

■ D.R. 5-105(A)[2] prohibits employment by a new client if the lawyer's independent professional judgment on behalf of the new client is likely to be affected. Nothing in the record even remotely suggests that Fahy's independent professional judgment in representing Mackall was affected by his prior representation of Randolph in an unrelated matter. We conclude that there was no conflict of interest and that the trial court's denial of the motion was clearly correct.

---

[2] D.R. 5-105(A) reads in pertinent part:
A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment . . . .

## II.

## JURY MATTERS

### A. Denial of Motion to Change Venue

Asserting that newspaper articles describing the crime were inaccurate and inflammatory, Mackall unsuccessfully sought a change of venue. Although he submitted the newspaper articles, Mackall did not inform the trial court nor does he tell this Court in what respects the articles were inaccurate and inflammatory. The trial court reviewed the articles and found them to be essentially accurate and non-inflammatory, and we agree with the court's finding.

A motion for change of venue is addressed to the sound discretion of the trial court and its denial of such a motion will not be reversed unless the record affirmatively establishes an abuse of discretion. *Watkins* v. *Commonwealth*, 229 Va. 469, 481, 331 S.E.2d 422, 432 (1985), *cert. denied*, 475 U.S. 1099 (1986); *Stockton* v. *Commonwealth*, 227 Va. 124, 137, 314 S.E.2d 371, 379, *cert. denied*, 469 U.S. 873 (1984). There is a presumption that a defendant can receive a fair trial from a jury of the vicinage. Accordingly, the defendant has the burden of establishing clearly such a pervasive prejudice among the citizens of the venue of the crime as to make it reasonably certain that he will not receive a fair trial. *Id.* at 137, 314 S.E.2d at 379-80. Merely showing extensive publicity or general knowledge of a crime or of the accused, including his criminal record, does not justify a change of venue. *Id.* at 137, 314 S.E.2d at 380.

The trial court had no difficulty in empaneling a jury. *Voir dire* of the venire revealed that 13 of the 24 prospective jurors recalled some, but very little, of the newspaper articles. All 13 prospective jurors testified that they would be able to disregard the information from the news media and base their verdict on the evidence presented at the trial. Mackall did not challenge any of these prospective jurors on the ground that pre-trial publicity affected their impartiality. The only venireman excused for cause was one who was opposed to the death penalty; all others were found to be fully qualified. Accordingly, we hold that the trial court did not abuse its discretion in refusing to order a change of venue.

## B. Limitations on *Voir Dire*

Alleging violations of his constitutional rights to a trial by a fair and impartial jury, and violations of the provisions of Code § 8.01-358, which requires the trial court to permit a defendant to question prospective jurors as to bias or prejudice, Mackall complains that the trial court would not let him ask prospective jurors whether they had any family or friends who were cashiers. The trial court already had permitted Mackall to ask whether any family members or friends had been victims of crime, whether this fact would affect their impartiality, and whether some of the prospective jurors' employment as cashiers would affect their impartiality. Additionally, Mackall did not request leave to ask a general question whether Mrs. Dahn's employment as a cashier would affect their impartiality in any way.

The proposed question whether prospective jurors had family or friends who were cashiers does deal with prospective bias and prejudice and is within the criteria of Code § 8.01-358. But, given the previous questions asked and the opportunity to ask a more general question, we cannot say the trial court abused its "discretion to determine when the parties have had sufficient opportunity to" ask the necessary questions within the statutory criteria. *LeVasseur v. Commonwealth*, 225 Va. 546, 581, 304 S.E.2d 644, 653 (1983), *cert. denied*, 464 U.S. 1063 (1984). Accordingly, we find no violation of Mackall's constitutional or statutory rights in the trial court's exclusion of this question.

We find no merit in Mackall's claim that the trial court improperly limited him to asking prospective jurors whether their opinion of the death penalty would affect their ability to consider life imprisonment or death as an appropriate punishment. The trial court permitted him to ask whether any jurors had views as to the death penalty; it did not let Mackall ask what those views were. Although either party may require prospective jurors to state clearly that whatever view they have of the death penalty will not prevent or substantially impair their performance as jurors in conformity with their oath and the court's instructions, *see Lockart v. McCree*, 476 U.S. 162, 176 (1986); *Adams v. Texas*, 448 U.S. 38, 45 (1980), Mackall cites no case and we find none holding that a party may inquire what prospective jurors' views of the death penalty might be. We conclude that the trial court properly limited Mackall's *voir dire* examination.

## C. Motions to Exclude Jurors for Cause

■ Mackall maintains that the trial court erroneously retained two veniremen who should have been excused for cause. Because the trial court saw and heard their examination, its findings are entitled to great weight. We will not reverse the decision to retain these veniremen absent a showing of manifest error or abuse of discretion. *See O'Dell*, 234 Va. at 693, 364 S.E.2d at 503. No such error has been shown in either of the two retentions.

■ (1) *Temple Barron*. Focusing on an affirmative answer to a confusing question as to the appropriateness of the death penalty, Mackall argues that the trial court should have struck Barron for cause. We pointed out in *Wise v. Commonwealth*, 230 Va. 322, 325-26, 337 S.E.2d 715, 717-18 (1985), *cert. denied*, 475 U.S. 1112 (1986), that the entire *voir dire* examination must be considered to resolve the issue. The balance of the examination of Barron demonstrated his willingness to follow the instructions of the court and to consider a sentence of less than death.

(2) *Sally Seesc*. Although Seesc exhibited some uncertainty as to what effect the rape of her mother nine months before Mackall's trial would have upon her impartiality, when questioned further she specifically said that although she felt uncomfortable, "it's a completely different case." She also said she had no doubt that she could be fair.

### III.

### GUILT PHASE

#### A. Admission of Evidence

(1) *April Dahn's Testimony*. Arguing that six-year-old April's testimony was a recollection not of the events surrounding her mother's murder but rather of a recent conversation she had with the Commonwealth's Attorney, Mackall maintains that the Commonwealth failed to establish her ability to remember the events in question. Mackall's premise is flawed; April testified that she was going to tell what she saw happen the day her mother was shot. Nowhere in the record do we find any indication that her testimony came from any other source than her own recollection.

Mackall's other contention is that April gave no "clear indication that she understood the difference between telling the truth and telling a lie." April said she knew what it meant to tell the

truth and indicated she would be punished if she did not tell the truth.

 Because of the opportunity a trial court has to see and observe a child's demeanor on the stand, his or her competence as a witness is a matter within the discretion of the trial court and its ruling will not be disturbed except for manifest error. *Kiracofe* v. *Commonwealth*, 198 Va. 833, 840, 97 S.E.2d 14, 18-19 (1957). A child is competent to testify if he or she possesses the capacity to observe, recollect, communicate events, and intelligently frame answers to the questions asked of him or her with a consciousness of a duty to speak the truth. *Cross* v. *Commonwealth*, 195 Va. 62, 64, 77 S.E.2d 447, 449 (1953). We find nothing in April's answers to questions dealing with her competency as a witness to indicate that the trial court abused its discretion in permitting her to testify.

 (2) *Autopsy Photograph of Victim.* Mackall contends that the trial court erred for two reasons in admitting an autopsy photograph of Mrs. Dahn. First, he argues it was redundant. He contends that other photographs of Mrs. Dahn had been admitted in evidence and the medical examiner could have used those photographs to identify the victim's body instead of using the autopsy photograph. At trial, Mackall did not raise the point and, therefore, we will not consider the point on appeal. Rule 5:25.

 Second, Mackall contends that the photograph was inadmissible because he had conceded that the body the medical examiner observed at autopsy was that of Mrs. Dahn. The contention is without merit. Mackall's counsel made an offer to stipulate, but the language he used was confusing. In any event, assuming he was willing to stipulate the victim's identity, he could not thereby prevent introduction of the photograph for purposes of identification. *See Arrington* v. *State*, 233 So. 2d 634, 636 (Fla. 1970); *State* v. *Duran*, 522 P.2d 1374, 1375 (Utah 1974).

 Furthermore, we see no reason why a trial court's traditional discretion in the admission of photographs taken of the victim, *Williams* v. *Commonwealth*, 234 Va. 168, 177, 360 S.E.2d 361, 367 (1987), *cert. denied*, 484 U.S. ____, 108 S.Ct. 733 (1988), should not include a determination of how many photographs may be introduced. Accordingly, we find no abuse of discretion in the admission of the autopsy photograph in this case.

 (3) *Demonstrative evidence.* Mackall argues that the medical examiner's insertion of a knitting needle into a styrofoam

model of a human head to illustrate the course of the bullet was unnecessary because her testimony was sufficient for that purpose. Admission of items of demonstrative evidence to illustrate testimonial evidence is also a matter within the sound discretion of a trial court. *See Peoples* v. *Commonwealth*, 147 Va. 692, 705, 137 S.E. 603, 607 (1927); *Curtis* v. *Commonwealth*, 3 Va. App. 636, 642, 352 S.E.2d 536, 540 (1987). Using the knitting needle and styrofoam head to demonstrate the trajectory of the bullet probably shortened the time needed to describe the bullet's points of entry and exit and its course through the head and made it easier for the jury to understand the medical examiner's description. We cannot say the trial court abused its discretion in admitting this evidence and permitting the demonstration.

## B. Instructions

(1) Mackall contends that the trial court erred in refusing to instruct the jury that the Commonwealth had the burden of proving malice as an essential element of capital murder. During the guilt phase of the trial, the court instructed the jury that the Commonwealth had to prove the killing was "willful, deliberate and premeditated" and that it "occurred during the commission of a robbery while Mackall was armed with a deadly weapon."

We said in *LeVasseur*, 225 Va. at 590-91, 304 S.E.2d at 658, "[m]alice inheres in the doing of a wrongful act intentionally or without just cause or excuse." Because the jury was instructed to determine whether the killing was willful, deliberate, and premeditated, we conclude that a separate instruction on malice was unnecessary. Malice is subsumed in proof of willfulness, deliberateness, and premeditation in the commission of a criminal offense. For that reason, the trial court correctly refused proffered instructions F and H.

(2) The trial court granted an instruction which told the jury in part that "you should not assume that the defendant is guilty because he has been indicted and is on trial." It refused instruction E that would have told the jury that "[t]he fact that the defendant has been indicted by a grand jury is not evidence against him and you should not consider it." We find no error in the court's action. The granted instruction correctly covered the subject of the effect of the indictment and the court was not obligated to grant a second instruction on the subject. *Gray*, 233 Va. at 351, 356 S.E.2d at 178.

## IV.

## SENTENCING PHASE

### A. Admission of Evidence

 Mackall assigns error to the trial court's admission of the testimony of Dr. Carole Rayburn, a clinical psychologist, regarding whether Mackall's anger and hostility, exhibited during his interviews with her, "might be transformed into violence."

Mackall says this was an inadmissible opinion upon the question of future dangerousness, an ultimate fact in issue. We disagree. We said in *Payne* v. *Commonwealth*, 233 Va. 460, 470, 357 S.E.2d 500, 506, *cert. denied*, 484 U.S. ____, 108 S.Ct. 309 (1987), that "the choice between death and life imprisonment is the ultimate issue for the jury" in a capital murder case.

### B. Exclusion of Evidence

 (1) *Patricia Hollingsworth.* Mackall proffered by Hollingsworth, his former probation officer, that following a previous conviction but before his incarceration, Mackall had told her that because he had too many friends "from the wrong group" at Lorton, his proposed place of incarceration, he wanted to be sent to another prison. The Commonwealth objected on the grounds of relevance. A trial court exercises a broad discretion in deciding whether collateral evidence is sufficiently relevant to admit in evidence. *Locke* v. *Commonwealth*, 149 Va. 447, 455, 141 S.E. 118, 121 (1928). We find no abuse of that discretion in this instance.

 (2) *Dr. Carole Rayburn.* Mackall has two complaints about the limitations the court imposed on her testimony. First, he complains that the court did not permit Dr. Rayburn to relate the details Mackall gave her of hallucinations he claimed to have experienced prior to her interview with him. Mackall claims that Dr. Rayburn's hearsay testimony of the details of the hallucinations were admissible as an exception to the hearsay rule because they were statements of past conditions or feelings made to medical personnel. That exception does not apply unless a physician says that the hearsay statements were used as a part of the basis of an opinion about the declarant's injuries or illness. *Cartera* v. *Commonwealth*, 219 Va. 516, 518, 248 S.E.2d 784, 786 (1978). Assuming, but not deciding, that declarations of a past mental condition are admissible under this exception, Mackall does not show

that the details of his hallucinations were a part of the basis of Dr. Rayburn's opinion.

Mackall's second complaint is that the trial court limited the examination of Dr. Rayburn on the basis for her opinion that Mackall was not mentally retarded, but in the dull-normal range of intelligence. The record shows affirmatively, however, that Dr. Rayburn gave the basis for her opinion. She testified that an intelligence test that another psychologist had administered to Mackall indicated he had an intelligence quotient of 64, which is in the range of mental retardation. She testified further that she did not agree with the results of the other test and that she thought Mackall had a dull-normal range of intelligence.

(3) *Thomas Barnes.* Mackall says the trial court erred in three respects in limiting the testimony of Barnes, Mackall's former classification and parole officer at the Lorton reformatory. First, although the court permitted Barnes to describe Mackall's yelling, screaming, and cursing while confined at Lorton, the court did not permit him to give the slang expression used at Lorton for that type of behavior. We fail to see how Mackall has been prejudiced by the trial court's exclusion of a slang expression for a type of behavior which had been fully described to the jury. Moreover, introduction of a slang term may have raised collateral issues and required a further explanation. A trial court has the discretion to limit the scope of collateral evidence. *Locke*, 149 Va. at 455, 114 S.E. at 121. We find no abuse of discretion in this instance.

Second, Mackall claims the trial court erred in refusing to admit evidence of his statements to Barnes, expressing doubt as to whether he would "be able to make it" when he was released from Lorton. Mackall's hearsay declarations could only be admitted if his state of mind at the time of the declaration was relevant to the issue of punishment. *Karnes v. Commonwealth*, 125 Va. 758, 764, 99 S.E. 562, 564 (1919); *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 201, 361 S.E.2d 436, 441 (1987). We fail to see how Mackall's doubt as to whether he could stay out of trouble when he was released from Lorton was relevant to the issue of punishment for a later crime.

Third, Barnes' reaction to the news of Mackall's arrest for the murder of Mrs. Dahn was excluded from jury consideration. There was no proffer of what Barnes' response might have been. For that reason we will not review the trial court's rulings on this

issue. *Barrett* v. *Commonwealth*, 231 Va. 102, 108, 341 S.E.2d 190, 194 (1986).

■ (4) *Terry Hollar*. Contending that admission of statements of past physical conditions or feelings made to medical personnel are admissible as an exception to the hearsay rule, Mackall claims the trial court erroneously excluded nurse Hollar's proffered testimony that Mackall told her upon his admission to the Prince William County jail that he used drugs.

The trial court correctly excluded this evidence for the same reason it excluded Dr. Rayburn's proposed testimony about Mackall's hallucinations. Assuming, but not deciding, that nurse Hollar could have expressed an opinion about Mackall's mental or physical condition, Mackall does not show that any such opinion would be based in part upon the fact that he took drugs at some time in the past.

## C. Instructions

Mackall contends that the trial court erroneously refused to grant three instructions he tendered dealing with sentencing. We find that all three instructions, A, C, and D, were properly rejected.

■ At the Commonwealth's request, the trial court granted Instruction 1 which submitted to the jury the issues of the vileness of the crime and the future dangerousness of the defendant as factors in determining whether the jury should impose a death sentence. Mackall argues that this instruction prejudiced him and the court should have used his Instruction A, which limited the issue to his future dangerousness. Because the jury based its verdict only on Mackall's future dangerousness, Mackall's argument is moot. *See Payne*, 233 Va. at 470, 357 S.E.2d at 506. Moreover, as noted later, the record amply supports the trial court's submission of the issue of Mackall's future dangerousness.

Instruction C read as follows:

> A mitigating circumstance does not have to be proven beyond a reasonable doubt to exist. You must find that a mitigating circumstance exists if there is any substantial evidence to support it.

We rejected an instruction using the same language in *LeVasseur*, 225 Va. at 594 n.5, 304 S.E.2d at 660-61 n.5, indicating that

there was no authority for such an instruction. Moreover, this instruction singles out a portion of the evidence for special emphasis. We have repeatedly held this to be improper. *Id.* at 595, 304 S.E.2d at 661; *Snyder v. Commonwealth*, 220 Va. 792, 797, 263 S.E.2d 55, 58 (1980); *Woods v. Commonwealth*, 171 Va. 543, 547-48, 199 S.E. 465, 467 (1938).

Instruction D provided:

> The law presumes that a defendant convicted of capital murder is innocent of any aggravating circumstances. The presumption of innocence is sufficient to justify a finding that no aggravating circumstances exist. Unless you are satisfied beyond a reasonable doubt of the defendant's guilt of at least one aggravating circumstance, you are instructed to return a verdict sentencing the defendant to life imprisonment.

■ Although there is a presumption of innocence of a crime, Mackall cites no authority to support his contention that there is a "presumption of innocence of any aggravating circumstances," and we find none. On the contrary, other jurisdictions have rejected the use of similar instructions in capital murder cases. *See Finney v. State*, 242 Ga. 582, 585, 250 S.E.2d 388, 391 (1978), *cert. denied*, 441 U.S. 916 (1979); *State v. Eaton*, 524 So. 2d 1194, 1207 (La. 1988).

### D. Failure of the Court to Strike the Evidence of Vileness in the Sentencing Phase

■ We need not consider this issue because, as previously noted, the jury did not base its verdict upon the vileness predicate for a death sentence but rather upon the predicate of future dangerousness. *Payne*, 233 Va. at 470, 357 S.E.2d at 506.

### V.

### SENTENCE REVIEW

#### A. Passion and Prejudice

■ Mackall contends that because of the foregoing allegedly erroneous rulings the death sentence was imposed under the influence of "passion, prejudice, and other arbitrary factors." Mackall articulates no other grounds that would indicate passion or prejudice. We have found no error in the questioned rulings;

therefore, we reject Mackall's contention. *See Pope* v. *Commonwealth*, 234 Va. 114, 127, 360 S.E.2d 352, 360 (1987), *cert. denied*, 485 U.S. ___, 108 S.Ct. 1489 (1988); *Wise*, 230 Va. at 335, 337 S.E.2d at 723. We also have reviewed the record as required by Code § 17-110.1(C)(2) and it fails to disclose that the jury was motivated by any improper influence in fixing Mackall's punishment at death.

## B. Excessiveness and Proportionality

Mackall's final contention is that the death sentence is excessive and disproportionate to that imposed in similar cases. Mackall's record discloses a list of larcenies and burglaries beginning when he was almost nine years old. Indeed, he has spent a large part of his life in correctional facilities and had been released from confinement only two months prior to Mrs. Dahn's murder. The Dahn murder, coupled with Mackall's calculated effort to kill Keating, Mackall's threats of violence to correctional officers, his possession of a deadly weapon while incarcerated, and his prior criminal record, amply justify the jury's conclusion of Mackall's future dangerousness.

We have compared the record in this case with the records in other capital murder cases which we have decided after the enactment of the present capital murder statute, paying particular attention to those cases in which the death penalty was imposed solely upon a consideration of future dangerousness of the defendant. *See O'Dell*, 234 Va. 672, 364 S.E.2d 491; *Townes*, 234 Va. 307, 362 S.E.2d 650; *Williams*, 234 Va. 168, 360 S.E.2d 361; *Pope*, 234 Va. 114, 360 S.E.2d 352; *Beaver*, 232 Va. 521, 352 S.E.2d 342; *Evans* v. *Commonwealth*, 228 Va. 468, 323 S.E.2d 114 (1984), *cert. denied*, 471 U.S. 1025 (1985); *Peterson* v. *Commonwealth*, 225 Va. 289, 302 S.E.2d 520, *cert. denied*, 464 U.S. 865 (1983); *Bassett* v. *Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982). Considering the crime and the individual involved in this case, our review persuades us that the jury's sentence of death was not excessive or disproportionate.

## VI.

## CONCLUSION

Our review of the record discloses no reversible error. Accordingly, we will affirm the judgments of the trial court.

*Affirmed.*