# Dawud Majid Mu'min a/k/a David Michael Allen

## v.

## Commonwealth of Virginia

Record No. 890899

March 2, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting, and Hassell, JJ.,
and Poff, Senior Justice

*Ronald Wayne Fahy; Lawrie R. Rollison; Steven D. Benjamin,* for appellant.

*David A. Rosenberg, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

SENIOR JUSTICE POFF delivered the opinion of the Court.

Dawud Majid Mu'Min, also known as David Michael Allen, was tried by a jury on an indictment charging capital murder. Invoking the three grounds defined in subsections (c), (d), and (e) of Code § 18.2-31 (Repl. Vol. 1988) (now, subsections (3), (4), and (5) of § 18.2-31), the indictment alleged that the killing had been committed while the accused "was a prisoner confined in a State or local correctional facility or while in the custody of an

employee thereof, or while in the commission of robbery, while armed with a deadly weapon, or during the commission of or subsequent to rape".

The verdict form submitted to the jury in the first phase of the bifurcated trial quoted the three grounds alleged in the indictment and instructed the jury to "strike out" any ground "that you do not find beyond a reasonable doubt." The jury marked through the third ground and returned a guilty verdict based upon the first and second grounds.

The verdict form submitted to the jury in the penalty phase of the trial quoted the language of Code § 19.2-264.4(C) defining the "dangerousness" and the "vileness" predicates and instructed the jury to strike out the language of either predicate "if either you do not unanimously find." The jury, "having considered the evidence in mitigation of the offense," returned the form unaltered and "unanimously fix[ed] . . . punishment at death." After reviewing the probation report required by Code § 19.2-264.5, the trial court entered judgment confirming the conviction and imposing the penalty fixed by the jury. We have consolidated the defendant's appeal of the conviction with the automatic review of the sentence, Code § 17-110.1(A) and (F), and accorded both priority on our docket, Code § 17-110.2.

## I. THE EVIDENCE

Most of the facts and circumstances related to the attack which led to the victim's death are drawn from the defendant's testimony at trial. Convicted in 1973 of first degree murder and sentenced to a term of 48 years, the defendant was an inmate at Haymarket Field Unit #26. On the morning of September 22, 1988, he and five other prisoners were transported to the Virginia Department of Transportation's Dale City Headquarters (VDOT) where they were assigned to a work detail supervised by a VDOT employee.

During the course of his work that morning, the defendant damaged the point of a screwdriver which he repaired with the use of a bench grinder. At the same time he used the grinder to sharpen a short piece of metal (sometimes referred to as a "highway spike") into the shape of a screwdriver, added a wooden handle, and attached the device to his shirt pocket with a holder fashioned from a paper clip. When the work crew suspended operations for lunch, the defendant crossed the perimeter fence

and walked along Interstate Route 95 a distance of approximately a mile to Ashdale Plaza, a shopping center. There, he entered Dale City Floors, a retail carpet store, and inquired of the operator, Mrs. Gladys Napwasky, about oriental carpets.

The defendant challenged the prices she quoted, and a heated argument ensued.[1] According to the defendant, she "started screaming . . . nigger this and nigger that" and "spit in [his] face." The defendant slapped her with his open hand, and she kicked him in the genitals. As the defendant fell to the floor, he "caught the top part of her pants" and pulled them "down right . . . by the thighs." Mrs. Napwasky "slashed" at him with a steak knife. The defendant "pushed her off and . . . went straight for the shirt pocket and . . . came up and hit her in the chest and hit her up in the neck." "Blood was coming from the nose and mouth and . . . a trickle of blood . . . from the neck." The defendant "checked her pulse to make sure she was okay", placed a wet washcloth on the neck wound, and "took the sleeve of [his] shirt and . . . wiped her face." While searching for a first aid kit, the defendant found four dollars in coins. He explained that he left the store intending to use the coins to purchase ice from a vending machine located in the shopping center to apply to his victim's wounds. Changing his mind, he re-entered the store and "started wiping all the things that [he] could remember that [he] had touched." When he returned to the VDOT, he washed blood from his shoes, took off his bloody shirt, "put it in the trash bag and threw it in the trash can." He discarded the weapon used in the attack along the highway. The defendant testified that he had not raped his victim.

A customer of the carpet store found Mrs. Napwasky lying on the floor and called a rescue squad. A paramedic testified that he had found her "face up on her back on the floor in a pool of blood that was around her head and upper body"; that she was naked below the waist and her blouse and brassiere had been pulled above the waist and her blouse and brassiere had been pulled above her breasts; that although her heart was beating, "she was breathless and pulseless" because there was "no . . . fluid for it to actually pump." The autopsy report identified 16 cuts and puncture wounds on the face, neck, chest, and left arm. A neck wound, three inches deep, severed the jugular vein. A wound four inches

---

[1] Other evidence showed, however, that Dale City Floors had not stocked oriental carpets for eleven years.

deep in the left chest cavity penetrated the left lung. Evidence of numerous "blunt-force trauma injuries" was found on her face and forehead. The victim's genital area was undisturbed.

The Commonwealth introduced the testimony of several of the defendant's fellow inmates concerning his conduct following arrest. One witness testified that the defendant had fallen to his knees, crying and saying that he had killed somebody. Another said that the defendant had told him that he had murdered and robbed his victim. A third prisoner testified that the defendant had conceived an escape plan involving the use of violence. In a search of the defendant's cell while he was awaiting trial, the authorities found a piece of metal taken from a typewriter page stand and an ear bracket from a pair of spectacles. Both appeared to have been sharpened.

## II. PRE-TRIAL ISSUES

### A. *Constitutional Challenges*

■ The defendant filed a motion to dismiss the indictment on the ground that the capital murder statutes are unconstitutional. The trial court rejected the several challenges articulated in a detailed memorandum. The defendant incorporated the memorandum in his brief filed in this Court. All the arguments urged by the defendant have been considered and rejected. See the decisions cited in *Spencer* v. *Commonwealth*, 238 Va. 563, 568-69, 385 S.E.2d 850, 853-54 (1989); *Watkins* v. *Commonwealth*, 238 Va. 341, 352, 385 S.E.2d 50, 56-7 (1989); *Buchanan* v. *Commonwealth*, 238 Va. 389, 412-13, 384 S.E.2d 757, 771 (1989), *cert. denied*, ____ U.S. ____, 110 S.Ct. 880 (1990); and *Pope* v. *Commonwealth*, 234 Va. 114, 121-22, 360 S.E.2d 352, 357 (1987), *cert. denied*, 485 U.S. 1015 (1988). We reaffirm our decisions in those cases.

### B. *Motion to Suppress*

The trial court overruled the defendant's motion to suppress statements he had made to an officer in two interviews conducted prior to his arrest. Initially, he stated that, upon hearing a scream, he had entered the carpet store to find "a white guy" with "long blond hair" who was "bending over" with "his pants pulled down" and a "lady . . . laying on the floor" alive but "bleeding through her mouth [and] nose". The white man fled, Mu'Min said, and

the defendant "went out the [back] door." Abandoning that account later, the defendant acknowledged that he had entered the store to inquire about an oriental rug and had struck Mrs. Napwasky twice during a bitter quarrel over prices. In significant respects, Mu'Min's two statements were irreconcilably inconsistent. They were no more incriminating than his testimony at trial.

 Attacking the trial court's ruling permitting selective portions of his extra-judicial statements to be read into evidence, the defendant contends that his statements were not voluntary because, he says, they were made while he was "incarcerated on a prior charge", while he "was tired and scared", and at a time when he was given no "opportunity to speak with legal counsel." He declares on brief that he "merely said what the Investigator wanted him to say in the misguided belief that the Investigator was going to help him."

> Admissibility of a defendant's statements is an issue to be decided by the [trial] court, which evaluates the credibility of the witnesses, resolves any conflicts in the testimony, and weighs the evidence as a whole. The court must decide whether the defendant knowingly and intelligently relinquished and abandoned his rights. The court's determination is a question of fact based upon the totality of the circumstances. This factual finding will not be disturbed on appeal unless plainly wrong.

*Watkins* v. *Commonwealth*, 229 Va. 469, 477, 331 S.E.2d 422, 429-30 (1985) (citations omitted), *cert. denied*, 475 U.S. 1099 (1986).

A review of the transcript of a tape recording of the testimony at the suppression hearing discloses no evidence of coercion. The two interviews were conducted at appropriate hours by a single investigator; the officer fully, definitively, and repeatedly advised Mu'Min of each of his *Miranda* rights; and the defendant expressly waived those rights.

The defendant was qualified, both by training and experience, to make a knowing and voluntary waiver. Mu'Min, a graduate of a private "prep" school, had earned a college degree in business administration and was literate in four languages. In his testimony at the suppression hearing, he acknowledged that, in response to questions propounded to him by the investigator, he had agreed

that he understood each element of the *Miranda* warnings, that he knew the interviews were being recorded, and that, because he had been represented by an attorney appointed to defend him at his 1973 murder trial, he was already aware that he was entitled to the advice of counsel. Nevertheless, he readily assented to the question whether he was "willing to talk . . . without consulting a lawyer or having a lawyer present."

■ We hold that the record completely supports the trial court's ruling denying the defendant's motion to suppress his extra-judicial statements.

## C. *Discovery*

Prior to trial, Mu'Min filed a motion to require the Commonwealth to disclose "the factual basis" for a claim of future dangerousness, one of the statutory predicates for the death penalty. Specifically, he requested detailed information concerning evidence of prior convictions, unadjudicated criminal charges, psychological evaluations, and any threatening statements made by the defendant which the Commonwealth intended to introduce at the penalty trial. Defense counsel claimed that, without such information, "the possibility arises of trial by ambush".

The trial court granted the motion, and the Commonwealth complied with the defendant's request. The Commonwealth then moved for disclosure[2] of those "facts in mitigation defendant intends to introduce at the penalty phase". The Commonwealth's Attorney explained that "we are merely asking for the same thing as defense asked of the Commonwealth". Granting the Commonwealth's motion, the court stated that the purpose of discovery is "to prevent total surprise" and that discovery "runs [in] both directions".

■ On appeal, Mu'Min contends that the trial court infringed his due process rights by not limiting the Commonwealth's discovery rights to those granted expressly by Rule 3A:11(c) and Code § 19.2-264.3:1(D).[3] Assuming without deciding that, as Mu'Min

---

[2] It is of no consequence that both Mu'Min and the Commonwealth labelled their pleadings as motions for bills of particulars. The titles are irrelevant; judged by their substance, the two pleadings are motions for discovery.

[3] If Mu'Min's argument can be read as a claim to a right to surprise or "ambush" the Commonwealth, we reaffirm our recent holding that no such right exists. *Bennett* v. *Commonwealth*, 236 Va. 448, 459, 374 S.E.2d 303, 311 (1988), *cert. denied*, 490 U.S. ____, 109 S.Ct. 1765 (1989).

argues, the trial court erred in granting the Commonwealth's motion, and assuming further that the error was not invited as the Attorney General contends, we hold that any such error was harmless beyond a reasonable doubt.[4]

The information the defendant disclosed was couched in broad generalizations. Indeed, Mu'Min's response to the discovery order contained little more than a routine recitation of the mitigating factors enumerated in Code § 19.2-264.4(B) and a reference to a "history of psychiatric evaluations". It did not contain the names of any potential witnesses or any other evidence Mu'Min intended to offer. Moreover, the transcript of proceedings at the penalty trial shows that the Commonwealth offered no evidence to rebut the testimony Mu'Min adduced as evidence in mitigation. The defendant cannot logically claim that he was prejudiced by a pretrial order granting the Commonwealth's discovery motion when his response disclosed nothing which gave the Commonwealth an unfair advantage at trial.

### D. *Jury Selection*

#### 1. Content Questions

In advance of trial, defense counsel submitted for approval a list of questions designed, in part, to determine what a prospective juror had seen, read, or heard about the case. Such questions are of a type characterized at bar as "content questions". The trial court refused to allow counsel to propound such questions, and Mu'Min argues on appeal that the court's refusal constituted "a denial of due process of law" and a violation of his right to "trial by an impartial jury".[5]

---

[4] Although a mere violation of Rule 3A:11(c) or Code § 19.2-264.3:1(D) would not require this "more stringent standard" of harmless error review, *see Dowling* v. *United States*, ＿＿ U.S. ＿＿, ＿＿, 110 S.Ct. 668, 671 (1990), we have applied that standard here because Mu'Min frames the issue in constitutional terms.

[5] Mu'Min also argues that the court's ruling "violated the express mandate of Code § 8.01-358". The defendant refers to the second paragraph of that statute which directs "[a] juror, knowing anything relative to a fact in issue, [to] disclose the same in open court." Construing that statute, we have said:

A party has no right, statutory or otherwise, to propound any question he wishes, or to extend *voir dire* questioning *ad infinitum*. The court must afford a party a full and fair opportunity to ascertain whether prospective jurors "stand indifferent in the cause," but the trial judge retains the discretion to determine whether the parties have had sufficient opportunity to do so.

*LeVasseur* v. *Commonwealth*, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), *cert. denied*, 464 U.S. 1063 (1984).

Sixteen of the 20 members of the jury panel had indicated on *voir dire* that they had acquired some information from the news media or from conversations with acquaintances. In reply to questions propounded, both by the court and by counsel during the course of an examination that consumed 172 pages of the transcript, all members of the panel attested, collectively and in groups of four, that they had not formed any opinion based upon the information they had acquired, were not sensible of any bias or prejudice, could enter the jury box with an open mind, and were able to render a fair and impartial verdict based upon the law and the evidence admitted at trial.

■ We agree with the Attorney General that an opportunity to pose the kind of "content questions" the defendant proposed is not a matter of right. *See United States* v. *Haldeman*, 559 F.2d 31, 67-8 (D.C. Cir 1976) (en banc), *cert. denied*, 431 U.S. 933 (1977) (affirming trial court's rejection of "content questions" on *voir dire* related to pre-trial publicity). The information a person acquires about a case from others may or may not prove to be the facts of the case as developed by evidence admitted at trial. Such information may or may not induce a person to form an opinion before trial. Any opinion formed before trial may or may not affect a person's ability as a juror to reach a different conclusion at trial.

■ Of course, parties litigant may properly inquire whether a prospective juror has acquired information about the case before trial. It does not follow that litigants have a constitutional right to know what that information is. They are entitled to know only whether the prospective juror, in reliance upon the information acquired, has formed an opinion and, if so, whether the juror can yet "stand indifferent in the cause". Code § 8.01-358; *L.E. Briley* v. *Commonwealth*, 222 Va. 180, 184-87, 279 S.E.2d 151, 154-55 (1981).

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin* v. *Dowd*, 366 U.S. 717, 723 (1961) (citations omitted). Quoting and applying this rule in a later case, the Supreme Court upheld the seating of a juror who had said on *voir dire*, "My experience of [the accused] is such that right now I would find him guilty." *Murphy* v. *Florida*, 421 U.S. 794, 802 n.5 (1975).

■ Here, none of the members seated on the panel had formed an opinion based upon the information acquired before trial, and all had affirmed on oath that they could stand indifferent in the cause. We hold, therefore, that the trial court did not err in disallowing the content questions proposed by the defendant.

### 2. Seating Two Jurors

Renewing objections raised during *voir dire*, Mu'Min moved to strike two jurors for cause. On appeal, he contends that the trial court erred in overruling his motions to strike Alexandria Santiago, a prospective alternate, and Gregory Dailey. He argues that Ms. Santiago was not impartial because, he says, she "had patronized Dale City Floors" and referred during *voir dire* to Mrs. Napwasky "by her first name".

The transcript shows that Ms. Santiago had said that she "knew Gladys", that their relationship had been "friendly", but that "we weren't friends." In reply to questions put by defense counsel, she affirmed that her contacts with the victim did not "cause [her] to form an opinion", that she was not "aware of any bias or prejudice", and that she was "able to render a fair and impartial verdict and set aside [her] knowledge of Mrs. Napwasky".

Mu'Min challenges the seating of Mr. Dailey on the ground that "his deliberations would [have been] hampered and rushed by the financial hardship caused by jury service in a lengthy case." According to the record before us, Mr. Dailey made no plea of personal financial hardship. Asked what hardship his service on the jury would cause, he said, "I'm doing telephone communications, and the company I work for is very small and it would jeopardize their business right now." This, he believed, could make him feel "rushed" and "could somewhat hamper" his ability as a juror to deliberate.

■ Under Code § 8.01-341.2, a person's duty to serve on a jury may be deferred or limited "if serving on a jury . . . would cause such a person a particular occupational inconvenience." The privilege, one the statute makes available at the discretion of the trial

court, is purely personal to the prospective juror and altogether unrelated to the inconvenience suffered by the person's employer. ▉▉▉ We find no merit in these assignments of error. Every question contemplated by Code § 8.01-358 and required by Rule 3A:14 was addressed to these prospective jurors by court and counsel. Every response Santiago and Dailey made fully supports the trial judge's conclusion that both were qualified to sit on the jury, and we will uphold his rulings.[6]

## III. GUILT TRIAL ISSUES

### A. *Evidentiary Rulings*

▉▉▉ One of the elements of one of the forms of the offense charged in the indictment was the status of the accused at the time the offense was committed, *i.e.*, that he was then "a prisoner confined in a state or local correctional facility".[7] Code § 18.2-31(c). As proof of Mu'Min's status, the Commonwealth offered in evidence at the guilt trial a copy of the order of conviction of first degree murder entered against Mu'Min in 1973. In keeping with its ruling against a motion that defense counsel had made *in limine*, the trial court admitted the order over the defendant's objection. On appeal, the defendant argues that evidence of prior crimes is inevitably prejudicial and that references the Commonwealth's Attorney made in the presence of the jury to the facts disclosed by that order compounded the prejudice. Accordingly,

---

[6] On brief, Mu'Min also complains generally that "[t]he trial court's voir dire . . . was essentially limited to inquiry whether a juror's views [concerning capital punishment] would prevent, not substantially impair, choosing one punishment or the other." Although the defendant had raised an objection on this ground during *voir dire*, he failed to object to the seating of any juror on that ground. Applying Rule 5:25 in a similar procedural context, we have refused to consider a challenge to a death-qualifying question. "If a party objects to rulings made during the voir dire of a prospective juror, but subsequently fails to object to the seating of that juror, the party has waived the voir dire objections." *Spencer* v. *Commonwealth*, 238 Va. 295, 306, 384 S.E.2d 785, 793 (1989). We apply that rule to Mu'Min's complaint.

[7] Defining this term, the trial court instructed the jury as follows:

An inmate of a state correctional facility remains an inmate at all times until he is released from that status by the proper state authority. An inmate who escapes from custody retains the status of inmate during the entire course of such an unauthorized absence.

This is a correct statement of the law in this Commonwealth. *See Ruffin* v. *Commonwealth*, 62 Va. (21 Gratt.) 790, 793-94 (1871); *see also Jefferson* v. *Commonwealth*, 214 Va. 747, 752, 204 S.E.2d 258, 262 (1974).

the defendant maintains that the trial court's rulings constituted reversible error. We do not agree.

A transcript of Mu'Min's interview with the investigator in which, eventually, he confessed his assault upon Mrs. Napwasky was read to the jury. As the following excerpt reveals, the defendant initiated several references to his prior conviction and to the sentence imposed.

WATSON: You tried to wipe off your fingerprints?

MU'MIN: Wipe my fingerprints off.

WATSON: Why did you do that?

MU'MIN: Because I'm a convicted murderer.

&ast; &ast; &ast;

WATSON: Why didn't you come forward with this story earlier?

MU'MIN: Because I'm a convicted murderer.

&ast; &ast; &ast;

MU'MIN: I know what you're — it's the same thing back in '73 . . . . When I got this murder charge I was sitting home. My aunt and my uncle both in the house, testified that I was home when a shot was fired, but because of certain physical evidence that they picked up, they had similarities and someone who said that he thought he saw me by the way someone walked, I've been sitting in the penitentiary since this, since this '73 incident, the last 15 years . . . .

&ast; &ast; &ast;

MU'MIN: I mean how can it — that look, you know, how can that look good for me? I'm a convicted murderer.

WATSON: Think about it.

MU'MIN: Serving a 48 year sentence.

■ These several references, integral parts of a confession we have found to be voluntary, were competent evidence. *See Boggs* v. *Commonwealth*, 229 Va. 501, 517, 331 S.E.2d 407, 419 (1985), *cert. denied* 475 U.S. 1031 (1986); *Bowman* v. *Commonwealth*, 174 Va. 461, 463, 5 S.E.2d 497, 498-99 (1939). We hold, there-

fore, that error, if any, resulting from the trial court's rulings concerning the 1973 order of conviction was rendered harmless by the defendant's own account of the same facts disclosed by that order. *See Schindel* v. *Commonwealth*, 219 Va. 814, 817, 252 S.E.2d 302, 304 (1979) (hearsay error rendered harmless by defendant's "own testimony corroborating the factual details").

■ Challenging another evidentiary ruling, Mu'Min argues that the trial court erred in excluding from the evidence a copy of a VDOT departmental regulation. The defendant offered the document to show that a VDOT employee assigned to supervise his work crew had not taken an oath as a peace officer as required by the regulation and, hence, that at the time the victim was killed, he was not "a prisoner . . . in the custody of an employee [of a correctional facility]" within the contemplation of Code § 18.2-31(c).

We need not consider this issue. The jury finding in the language of § 18.2-31(c) was only one of the bases for the guilty verdict. The jury also rested its verdict upon its finding in the language of § 18.2-31(d) that Mu'Min committed the killing "during the commission of robbery while . . . armed with a deadly weapon." Consequently, the issue raised on appeal is moot. *Cf. Zant* v. *Stephens*, 462 U.S. 862 (1983) (death penalty upheld although one of three statutory aggravating circumstances subsequently declared invalid); *accord Poyner* v. *Commonwealth*, 229 Va. 401, 427, 329 S.E.2d 815, 830, *cert. denied*, 474 U.S. 888 (1985); *Tuggle* v. *Commonwealth*, 230 Va. 99, 110, 334 S.E.2d 838, 845 (1985), *cert. denied* 478 U.S. 1010 (1986); *Stout* v. *Commonwealth*, 237 Va. 126, 134, 376 S.E.2d 288, 292, *cert. denied*, 492 U.S. ____, 109 S.Ct. 3263 (1989).

### B. *Jury Instructions*

■ The defendant assigns error to the trial judge's rulings refusing four instructions relating to Mu'Min's contention that he was not a prisoner within the intendment of Code § 18.2-31(c) and his ruling granting the Commonwealth's instruction to the contrary (see footnote 7 *supra*). For the reason just stated, we need not address these assignments of error.

Mu'Min also questions another ruling on another instruction granted by the trial court. Instruction number 1 defined capital murder in terms of the three statutory definitions charged in the indictment and the elements of the lesser-included offenses of first

and second degree murder and voluntary manslaughter. The defendant believes that the instruction defined first degree murder and the standard of proof incorrectly and that the trial court erred in refusing his substitute draft.

In pertinent part, instruction number 1 told the jury that if they failed to find any of the three predicates for capital murder,

but find that the Commonwealth has proved beyond a reasonable doubt:

(1) That the defendant killed Gladys Napwasky; and

(2) That the killing was malicious; and

(3) That the killing was willful, deliberate and premeditated,

then you shall find him guilty of first degree murder. . . .

█ We find no error in this instruction. Indeed, we see no material difference between this definition and that of the substitute draft, and we reject the defendant's complaint.

## IV. PENALTY TRIAL ISSUES

### A. *Passion or Prejudice*

█ Whenever the death penalty is imposed, this Court is required to review the record to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor". Code § 17-110.1(C)(1). The defendant claims that the trial court committed error by refusing the jury's request for a definition of the particulars of a life sentence. We disagree. Rejecting a similar claim in an earlier capital case, we said that the jury's question actually "tends to show that the jury's deliberations were dispassionate, unprejudiced, and guided by earnest consideration of every factor relevant to the portentous decision they were required to make." *Delong* v. *Commonwealth*, 234 Va. 357, 370, 362 S.E.2d 669, 676 (1987), *cert. denied*, 485 U.S. 929 (1988).

█ The defendant also suggests that the jury's penalty decision was the result of some "other arbitrary factor". The defendant offered in evidence at the penalty trial a copy of a departmental regulation providing that "[a] prisoner . . . shall not be

left without supervision at any time." In response to the Common-wealth's objection, the trial judge said, "I question the relevancy . . . ." The defendant urges us to commute the sentence of death on the ground that the judge's comment influenced the jury "to disregard a major component of the defendant's evidence in mitigation."

For two reasons, we decline to do so. First, the transcript shows that the judge's comment was made to the attorneys in a side-bar conference. Having in mind the purpose of such a conference, we think it is unlikely that the comment was heard by the jury. Second, even if the comment was overheard, the trial court's decision to overrule the Commonwealth's objection and admit the docu-ment for the jury's consideration cured any prejudice the com-ment may have caused.

 Having conducted a thorough review of the voluminous record of both phases of the trial, we find nothing to show that the penalty imposed by the jury and confirmed by the trial court was the product of passion, prejudice, or other arbitrary factor.

## B. *Propriety of the Sentence*

As required by Code § 17-110.1(C)(2), we must now determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

### 1. Excessiveness

 A death penalty is inherently excessive unless it is based upon what has come to be known as the "dangerousness predi-cate" or the "vileness predicate". Code § 19.2-264.4(C) provides:

> The penalty of death shall not be imposed unless the Com-monwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the com-mission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a con-tinuing serious threat to society, or that his conduct in com-mitting the offense was outrageously or wantonly vile, horri-ble or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

Tracking the language of the statute as incorporated in the court's instruction number 1, the jury's verdict based the death penalty upon both predicates.

The defendant challenges the jury's finding of the vileness predicate because, he says, the Commonwealth's Attorney failed "to include torture in his bill of particulars" and "the evidence . . . did not establish torture."[8] We think the evidence of the multiple, grievous wounds inflicted upon Mrs. Napwasky was sufficient to prove torture, *see Tuggle* v. *Commonwealth*, 228 Va. 493, 516, 323 S.E.2d 539, 553 (1984), *vacated and remanded on other grounds*, 471 U.S. 1096 (1985) ("torture" correctly included in vileness instruction where evidence was sufficient to show victim, "[w]hile still alive, . . . was severely bruised and bitten on her breast"). However, it is immaterial that the jury instruction and the jury's verdict contained the word "torture" when the bill of particulars did not. It is immaterial because, as defined in Code §§ 19.2-264.2 and -264.4(C), "the term 'vileness' includes three separate and distinct factors, with proof of any one factor being sufficient to support a finding of vileness and hence a sentence of death." *Bunch* v. *Commonwealth*, 225 Va. 423, 442, 304 S.E.2d 271, 282, *cert. denied*, 464 U.S. 977 (1983).

The autopsy report identified 16 cuts and puncture wounds on the victim's face, neck, chest, and left arm and numerous blunt-force injuries to the face and forehead. Clearly, the evidence was sufficient to prove an "aggravated battery", *i.e.*, "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *M. Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979). Indeed, a single stab wound may, under certain circumstances, be sufficient to satisfy this definition. *See, e.g., Stout* v. *Commonwealth*, 237 Va. at 132-33, 376 S.E.2d at 291-92; *Edmonds* v. *Commonwealth*, 229 Va. 303, 313, 329 S.E.2d 807, 814, *cert. denied*, 474 U.S. 975 (1985).

In light of the "evidence of the prior history of the defendant [and] of the circumstances surrounding the commission of the offense", Code § 19.2-264.4(C), we think the jury was en-

---

[8] In another argument advanced on brief, Mu'Min says that "the sentence of death is excessive" because, had the government "exercised rudimentary care in supervision of the defendant, this crime would not have been committed." In effect, the defendant argues that an escapee who commits murder is entitled to immunity from the death penalty for his intrepidity in escaping supervision. We are unpersuaded.

tirely justified in finding that the defendant "would constitute a continuing serious threat to society", *id*. We need not recite the details of that evidence. It is enough that we have found proof of the vileness predicate sufficient to support the imposition of the death penalty. "When a jury makes separate findings of specific statutory aggravating circumstances, any of which could support a sentence of death, and one of the circumstances subsequently is invalidated, the remaining valid circumstance, or circumstances, will support the sentence." *Tuggle* v. *Commonwealth*, 230 Va. at 110, 334 S.E.2d at 845, quoted with approval in, *Stout* v. *Commonwealth*, 237 Va. at 134, 376 S.E.2d at 292.

## 2. Disproportionality

Code § 17-110.1(C)(2) requires us to compare the case under review with "similar cases" in making our determination whether "the sentence of death is excessive or disproportionate". To facilitate that comparison as directed in § 17-110.1(E), we have accumulated the records in all capital murder cases to come before this Court (including those in which the penalty imposed was a life sentence) and stored and indexed those records apart from those in all other criminal cases. In selecting cases from that inventory for purposes of our comparison, we give special attention to those in which the death penalty was based upon the same statutory predicate (or predicates) as that underlying the penalty under review.

The cases in which the death penalty was based, as it was here, upon both the "future dangerousness" predicate and the "vileness" predicate are collected and annotated in our recent opinion in *Spencer* v. *Commonwealth*, 238 Va. 295, 319-20, 384 S.E.2d 785, 799-800 (1989). *See also R. Smith* v. *Commonwealth*, 239 Va. 243, 389 S.E.2d 871 (1990). We have compared the records in those cases with that in the case at bar, and we are satisfied that "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980).

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

By counsel appointed specially, Mu'Min charges that his trial lawyer was ineffective because he failed at the penalty trial

to submit certain instructions and to object to several instructions as well as to the verdict form approved by the trial court. These failures, he says, are patently prejudicial and unjustifiable by any acceptable explanation. In *Beaver v. Commonwealth*, 232 Va. 521, 352 S.E.2d 342, *cert. denied*, 483 U.S. 1033 (1987), we rejected just such a claim.

> Defendant complains of errors of omission committed by his trial counsel. Yet the record contains no testimony from trial counsel concerning his alleged acts of omission. Were we to attempt to dispose of defendant's contentions on this record, we would be called upon to declare the work of an attorney to be ineffective without that attorney having an opportunity to explain his conduct. [citation omitted.]

> The defendant argues, however, that though the record does not contain everything that relates to the question of ineffective assistance of counsel, it contains enough to establish that trial counsel failed to do things that obviously should have been done and for which there can be no acceptable explanation. However, [Code § 19.2-317.1] does not say that we can proceed where there is partial evidence of ineffectiveness. The statute presupposes a full record on the very issue that is the basis for the claim of ineffective assistance of counsel. We conclude, therefore, that defendant's claim of ineffective assistance of trial counsel cannot be raised in this appeal.

*Id.* at 537-38, 352 S.E.2d at 351-52.

Applying the qualifying language of Code § 19.2-317.1,[9] we remain committed to our previous rulings. Trial counsel will not be exposed to the possibility of professional disgrace without "an opportunity to defend himself on the record by giving the rationale for his challenged acts of omission or commission". *Correll* v. *Commonwealth*, 232 Va. 454, 470, 352 S.E.2d 352, 362, *cert. denied*, 482 U.S. 931 (1987); *accord Frye* v. *Commonwealth*, 231 Va. 370, 400, 345 S.E.2d 267, 287-88 (1986). *See R. Smith*, 239

---

[9] Code § 19.2-317.1 provides:

> A claim of ineffective assistance of counsel may be raised on direct appeal if assigned as error and if all matters relating to such issue are fully contained within the record of the trial.

Va. at 271 n. 5, 389 S.E.2d at 886 n. 5. Mu'Min's claim of ineffective assistance of counsel cannot be considered in this appeal.

## VI. CONCLUSION

Finding no reversible error in the conduct of either phase of the bifurcated trial and no cause to commute the death sentence, we will affirm the judgment confirming the jury's two verdicts.

*Affirmed.*

JUSTICE WHITING, with whom JUSTICE STEPHENSON and JUSTICE HASSELL join, dissenting.

I cannot agree that the trial court correctly excluded all of the questions intended for the 16 prospective jurors who said they had acquired pretrial information about the offense. A trial court's assessment of prospective jurors' potential for bias is presumptively correct, *Patton v. Yount*, 467 U.S. 1025, 1036 (1984); *Pope v. Commonwealth*, 234 Va. 114, 124, 360 S.E.2d 352, 358 (1987), absent manifest error, *Patton*, 467 U.S. at 1031-32 n.7; *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *Pope*, 234 Va. at 124, 360 S.E.2d at 358. In this case, however, I believe there was "manifest error" in refusing to permit *any* of the questions necessary to establish a factual and objective basis for assessing juror impartiality.

The record discloses an unusual amount of pretrial publicity. The charge involved the alleged capital murder of a local resident by a convict who was serving a part of his sentence for first degree murder as a member of a road gang. After this murder, county officials and local citizens publicly expressed surprise, outrage, and fear for the safety of local residents upon discovery that prisoners like Mu'Min, who had been convicted of violent crimes, were permitted to work in such close contact with the public. When the prospective jurors were assembled, 16 of them responded affirmatively to the question of whether they had "acquired any information from the news media or from any other source" regarding the offense. The trial court then asked:

Would the information that you heard, received, or read from whatever source, would that information affect your impartiality in this case?

Is there anyone that would say what you've read, seen, heard, or whatever information you may have acquired from whatever the source would affect your impartiality so that you could not be impartial?

. . . .

In view of everything that you've seen, heard, or read, or any information from whatever source that you've acquired in this case, is there anyone who believes that you could not become a Juror, enter the Jury box with an open mind and wait until the entire case is presented before reaching a fixed opinion or a conclusion as to the guilt or innocence of the accused?

Only one prospective juror responded to these inquiries; the balance remained silent. That prospective juror was excused for cause when he said he could not be impartial.

Because of the trial court's ruling, we do not know what the prospective jurors had read or heard about the case before trial. We do know, however, that the following information regarding the accused, not a part of the evidence at the guilt phase of trial, was published in the local papers:

1. His suspected assault upon a fellow prisoner, resulting in a broken nose.

2. His citation for 23 prison violations and his rejection for parole on six previous applications.

3. His 1973 conviction for the murder and robbery of a Grayson County cab driver, with some details of the crime and a statement from the Grayson County prosecutor that the death penalty was not available when the accused was convicted.

4. His juvenile record in New York and Virginia.

5. His alleged commission of a burglary and engagement in "Peeping Tom" activities while a prisoner. Also, there were indications that a rape may also have been involved in the commission of this murder.

An accused has statutory and constitutional rights to trial by an impartial jury. I do not believe that defense counsel was afforded a meaningful voir dire examination of prospective jurors, as mandated by Code § 8.01-358. The majority disposes of this contention in a footnote (n.3) by relying upon *LeVasseur* v. *Commonwealth*, where we said that "[a] party has no right, statutory or

otherwise, to propound any question he wishes, or to extend *voir dire* questioning *ad infinitum.*" 225 Va. at 581, 304 S.E.2d at 653. Nothing in the record in the present case, however, suggests that defense counsel sought to "propound any question he wishe[d], or to extend *voir dire* questioning *ad infinitum.*"

Code § 8.01-358 mandates that "counsel for either party shall have the right to examine under oath any person who is called as a juror . . . and shall have the right to ask such person . . . directly any relevant question to ascertain whether he . . . is sensible of any bias or prejudice." The section further provides that "[a] juror, knowing anything relative to a fact in issue, shall disclose the same in open court." Code § 8.01-358. Moreover, as we said in *LeVasseur*, "[t]he court must afford a party a full and fair opportunity to ascertain whether prospective jurors 'stand indifferent in the cause.' " 225 Va. at 581, 304 S.E.2d at 653.

In enacting Code § 8.01-358, the General Assembly intended to provide counsel a meaningful voir dire examination. Clearly, questions pertaining to what a prospective juror had seen, read, or heard about the case are "relevant . . . to ascertain whether he . . . is sensible of any bias or prejudice." Therefore, the court violated Mu'Min's statutory right to trial by an impartial jury.

Additionally, "[u]nder the Federal and State Constitutions, U.S. Const. amends. VI and XIV; Va. Const. art. 1, § 8, an accused has a right to trial by an 'impartial jury.' " *Wm. Patterson v. Commonwealth*, 222 Va. 653, 658, 283 S.E.2d 212, 215 (1981). As illustrated by the majority opinion, 239 Va. at 443-44, we frequently apply federal decisions construing the Sixth Amendment right to an impartial jury in construing this same right under art. 1, § 8 of the Virginia Constitution. *See also, Mackall* v. *Commonwealth*, 236 Va. 240, 251, 372 S.E.2d 759, 766 (1988), *cert. denied*, 109 S.Ct. 3261 (1989).

An accused's right to trial by an impartial jury is violated if jurors are impanelled after an inadequate voir dire examination. *See, e.g., Turner* v. *Murray*, 476 U.S. 1 (1986). If the examination is inadequate, the accused's right is prejudiced in two respects; he is unable to exercise effectively his right of challenge, *United States* v. *Dellinger*, 472 F.2d 340, 368 (7th Cir. 1972), *cert. denied*, 410 U.S. 970 (1973), and the trial court is unable to assess fairly the prospective jurors' impartiality. *United States* v. *Davis*, 583 F.2d 190, 197-98 (5th Cir. 1978).

Thus, when there has been unusual pretrial publicity in a criminal case, the Supreme Court has said that there must be "fair support in the record for the state courts' conclusion that the jurors . . . would be impartial." *Pattòn*, 467 U.S. at 1038. Moreover, where prospective jurors have indicated that they were exposed to pretrial publicity in response to questions similar to those posed in this case, we have warned: "[T]he *proof* that [a prospective juror] is impartial and fair, should *come from him* and not be based on his mere assent to persuasive suggestions." *Breeden* v. *Commonwealth*, 217 Va. 297, 300, 227 S.E.2d 734, 736 (1976) (emphasis added) (citations omitted).

In other words, "in the absence of an examination designed to elicit answers which provide an *objective basis* for the court's evaluation, 'merely going through the form of obtaining jurors' assurances of impartiality is insufficient . . . .' " *Silverthorne* v. *United States*, 400 F.2d 627, 638 (9th Cir. 1968) (emphasis added) (citations omitted). In at least two of our cases involving pretrial publicity, we have said that a trial court should have rejected such subjective assurances. *Justus* v. *Commonwealth*, 220 Va. 971, 977, 266 S.E.2d 87, 91 (1980); *Breeden*, 217 Va. at 298-300, 227 S.E.2d at 736-37. "[H]owever willing the juror might be to trust himself, the law will not trust him." *Breeden*, 217 Va. at 298, 227 S.E.2d at 735 (citations omitted).

Accordingly, whether a juror can impartially render a verdict "should not be [based] on that juror's [subjective] assessment of self-righteousness without something more." *Silverthorne*, 400 F.2d at 639. Instead, a trial court must objectively and independently assess each prospective juror's state of mind.

> When a juror is exposed to potentially prejudicial pretrial publicity, it is necessary to determine whether the juror can lay aside any impression or opinion due to the exposure. The juror is poorly placed to make a determination as to his own impartiality. Instead, the *trial court* should make this determination.

*Jordan* v. *Lippman*, 763 F.2d 1265, 1274 (11th Cir. 1985) (emphasis added) (citation omitted). "The issue of who is, or is not, a competent juror is one for the trial court to decide," *Justus*, 220 Va. at 976, 266 S.E.2d at 91, not the juror himself.

Furthermore, I believe the questions in this case were deficient in that the prospective jurors could simply remain silent as an implied indication of a lack of bias or prejudice. This gave the trial court no effective opportunity to assess the demeanor of each prospective juror in disclaiming bias. Moreover, even if the court had required an express affirmation of each prospective juror, such an affirmation would have required an admission of bias or prejudice before the assembled panel. "No doubt each juror was sincere when he said that he would be fair and impartial to the [accused], but the psychological impact requiring such a declaration before one's fellows is often its father." *Irvin*, 366 U.S. at 728.

Apparently, we have never addressed the *necessity* of such questions at voir dire, where panel members have been exposed to unusual pretrial publicity. However, we have ample precedent for such questions. In *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974), the trial court sought a description of what was actually remembered by those prospective jurors who had been subjected to pretrial publicity. There, we sustained the trial court's objective findings regarding the impartiality of those prospective jurors, who we noted had remembered few of the details of such publicity. *Id.* at 717, 204 S.E.2d at 420. Although not the subject of our discussion, an inspection of the appendices in the following cases indicates that "content" questions were likewise asked of prospective jurors exposed to pretrial publicity. *Mackall v. Commonwealth*, 236 Va. 240, 372 S.E.2d 759 (1988); *LeVasseur v. Commonwealth*, 225 Va. 564, 304 S.E.2d 644 (1983), *cert. denied*, 464 U.S. 1063 (1984); *Bassett v. Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982); *Justus*, 220 Va. 971, 266 S.E.2d 87; *Breeden*, 217 Va. 297, 227 S.E.2d 734; *Greenfield*, 214 Va. 710, 204 S.E.2d 414.

The questions proffered by the accused,[1] and refused by the court, were clearly designed to provide a factual and objective basis for assessing the potential for bias.[2] Some prospective jurors

---

[1] The tenor of the proffered questions was: What have you seen, read or heard about this case; from whom did you get this information; when and where did you get this information; have you discussed this case with anyone; with whom; when and where; what did you discuss; if an opinion had been formed, what is it; has anyone expressed an opinion about this case to you; who; what; when; and where?

[2] Without necessarily approving each of the proffered questions, if the trial court permits no questions regarding the source and extent of exposure to pretrial publicity, and, therefore, content questions are necessary, at minimum, I believe each prospective juror subjected to pretrial publicity should have been asked what information he recalled and

may honestly have felt that the publicity had not affected their impartiality; however, a disclosure of what was actually remembered could lead an impartial observer to conclude that there was a bias of which the potential juror was unaware, as in *Justus* and *Breeden.* "Voir dire examination serves to protect [the right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors." *McDonough Power Equipment* v. *Greenwood,* 464 U.S. 548, 554 (1984).

I believe that the majority's citation of *United States* v. *Haldeman,* 559 F.2d 31 (D.C. Cir. 1976), for the proposition that the opportunity to ask "content questions" is "not a matter of right," misconstrues the essence of that holding. The *Haldeman* Court explicitly agreed that a certain ABA Standard "mandate[d] an inquiry into the *sources and intensity* of a venireman's exposure to pretrial publicity, not an inquiry into his recollection of the content of that publicity." *Id.* at 69 (emphasis added). Moreover, emphasizing that the voir dire in *that* defendant's case permitted counsel to determine the *nature and intensity of the exposure* to pretrial publicity, the Court stated:

> We agree that it would have been reversible error for the Court to accept jurors simply because they said they would be fair . . . . In this case, however, the Court had before it and acted on not only the jurors' subjective assurances but also *objective information* relating how closely they had followed Watergate and their *sources* of information.

*Id.* at 67 n.51 (citations omitted) (emphasis added). In addition, *Haldeman* distinguished *Dellinger* and *Silverthorne,* two cases involving constitutionally inadequate voir dire, on the ground that the trial courts in those cases failed to permit *any* questions concerning the source and intensity of exposure to pretrial publicity. *See id.* at 69.

As in *Dellinger* and *Silverthorne,* the trial court in this case rejected *all* voir dire questions aimed at determining the source and intensity of exposure to pretrial publicity, as well as "content" questions. In my view, it was not necessarily error to preclude some or even all of the "content" questions; however, the trial

---

when it was received. Moreover, the risk of "tainting" the other prospective jurors could have been minimized by excluding the others from the courtroom during each examination, or by examining them in smaller groups, as the court did.

court's conduct of voir dire was constitutionally inadequate, even under *Haldeman*, in its blanket refusal to permit *any* questions aimed at determining the *sources and intensity* of exposure to pretrial publicity (e.g., where did you hear about this case; how many times did you hear about it; and when did you hear about it).

In my opinion, under the circumstances of this case, the refusal to permit any questions regarding the source and intensity of knowledge regarding pretrial publicity violated the accused's statutory and constitutional right to trial by an impartial jury. Although I agree with the majority opinion in all other respects, I would reverse the judgment of the trial court and remand the case for a new trial at which appropriate voir dire questions should be asked.